**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JOHN PEREZ,** | : | |
| **243 N. 4th Street** | : | **CIVIL ACTION** |
| **Allentown, PA 18102,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | **No.** |
| **vs.** | : | |
| | : | |
| **OFFICER JOSE LEBRON,** | : | |
| *Individually and in his official capacity as a* | : | |
| *member of the Allentown Police Department* | : | |
| **425 Hamilton Street** | : | |
| **Allentown, PA 18101,** | : | |
| | : | |
| **OFFICER NEIL BATTONI,** | : | |
| *Individually and in his official capacity as a* | : | |
| *member of the Allentown Police Department* | : | **Jury Trial Demanded** |
| **425 Hamilton Street** | : | |
| **Allentown, PA 18101,** | : | |
| | : | |
| **OFFICER MATTHEW VERNON,** | : | |
| *Individually and in his official capacity as a* | : | |
| *member of the Allentown Police Department* | : | |
| **425 Hamilton Street** | : | |
| **Allentown, PA 18101,** | : | |
| | : | |
| **OFFICER JONATHAN SMITH,** | : | |
| *Individually and in his official capacity as a* | : | |
| *member of the Allentown Police Department* | : | |
| **425 Hamilton Street** | : | |
| **Allentown, PA 18101,** | : | |
| | : | |
| **OFFICER CHRISTOPHER MATTHEWS,** | : | |
| *Individually and in his official capacity as a* | : | |
| *member of the Allentown Police Department* | : | |
| **425 Hamilton Street** | : | |
| **Allentown, PA 18101,** | : | |

**OFFICER SCOT WALZ,**                                           :
*Individually and in his official capacity as a*                :
*member of the Allentown Police Department*                     :
**425 Hamilton Street**                                         :
**Allentown, PA 18101,**                                        :
                                                                :
**OFFICER YAMIL CASTILLO,**                                     :
*Individually and in his official capacity as a*                :
*member of the Allentown Police Department*                     :
**425 Hamilton Street**                                         :
**Allentown, PA 18101,**                                        :
                                                                :
**OFFICER PREET BAJWA,**                                        :
*Individually and in his official capacity as a*                :
*member of the Allentown Police Department*                     :
**425 Hamilton Street**                                         :
**Allentown, PA 18101,**                                        :
                                                                :
**JOHN/JANE DOES 1-X,**                                         :
*Individually and in their official capacities as*              :
*members of the Allentown Police Department*                    :
**425 Hamilton Street**                                         :
**Allentown, PA 18101,**                                        :
                                                                :
**MAYOR RAY O'CONNELL,**                                        :
*Individually and in his official capacity as*                  :
*Mayor of the City of Allentown*                                :
**435 Hamilton Street**                                         :
**Allentown, PA 18101,**                                        :
                                                                :
**FORMER CHIEF TONY ALSLEBEN,**                                 :
*Individually and in his official capacity as the*              :
*Former Chief of the Allentown Police Department*               :
**6582 Pioneer Drive**                                          :
**Macungie, PA 18062,**                                         :
                                                                :
              **and**                                           :
                                                                :

**CITY OF ALLENTOWN,**              :
**435 Hamilton Street**               :
**Allentown, PA 18101,**              :
                                                :
                **Defendants.**          :

## COMPLAINT

**NOW COMES**, the Plaintiff, John Perez, by and through his legal counsel, Robert E. Goldman, Esquire, and does hereby allege and aver the following:

## I.   JURISDICTION AND VENUE

1. This action is instituted under the United States Constitution, particularly under the provisions of the Fourth and Fourteenth Amendments, and under federal law, particularly the Civil Rights Act of 1871 (hereinafter referred to as the "Act"), <u>as amended</u>, 42 U.S.C. §§ 1981, 1983, 1985 and 1988.

2. This Court has jurisdiction in this matter pursuant to 28 U.S.C. § 1331, § 1343(a)(3), § 1343(a)(4) and § 1367(a), regarding the principles of pendent and supplemental jurisdiction over related state law claims.

3. Venue in the Eastern District of Pennsylvania is properly laid pursuant to 28 U.S.C. § 1391, insofar as the alleged unlawful conduct complained of in this Complaint, which forms the factual and legal basis of the Plaintiff's claims, arose within the geographical limits of this District in general and within the geographical limits of the City of Allentown, Lehigh County, Pennsylvania, in particular.

## II.    **PARTIES**

4.    Plaintiff John Perez (hereinafter "Perez" or "Plaintiff") is an adult individual, who has a home address of 243 N. 4th Street, Allentown, Lehigh County, Pennsylvania, 18102.

5.    Defendant Officer Jose Lebron (hereinafter referred to as "Lebron") is an adult individual who, at all times relevant hereto, was serving in his capacity as a sworn officer of the Allentown Police Department, and was entrusted with the power to enforce the laws of the Commonwealth of Pennsylvania and the Ordinances of the City of Allentown.  Defendant Lebron was entrusted with the obligation to protect the Constitutional rights of those he encountered, and at all times relevant hereto, was acting under the authority and color of law, and in concert with one or more of the other individual Defendants in the performance or conduct of their actions, or acted independently of them.

6.    Defendant Officer Neil Battoni (hereinafter referred to as "Battoni") is an adult individual who, at all times relevant hereto, was serving in his capacity as a sworn officer of the Allentown Police Department, and was entrusted with the power to enforce the laws of the Commonwealth of Pennsylvania and the Ordinances of the City of Allentown.  Defendant Battoni was entrusted with the obligation to protect the Constitutional

rights of those he encountered, and at all times relevant hereto, was acting under the authority and color of law, and acted in concert with one or more of the other individual Defendants in the performance or conduct of their actions, or acted independently of them.

7.   Defendant Officer Matthew Vernon (hereinafter referred to as "Vernon") is an adult individual who, at all times relevant hereto, was serving in his capacity as a sworn officer of the Allentown Police Department, and was entrusted with the power to enforce the laws of the Commonwealth of Pennsylvania and the Ordinances of the City of Allentown.  Defendant Vernon was entrusted with the obligation to protect the Constitutional rights of those he encountered, and at all times relevant hereto, was acting under the authority and color of law, and acted in concert with one or more of the other individual Defendants in the performance or conduct of their actions, or acted independently of them.

8.   Defendant Officer Jonathan Smith (hereinafter referred to as "Smith") is an adult individual who, at all times relevant hereto, was serving in his capacity as a sworn officer of the Allentown Police Department, and was entrusted with the power to enforce the laws of the Commonwealth of Pennsylvania and the Ordinances of the City of Allentown.Defendant Smith was entrusted with the obligation to protect the Constitutional rights

of those he encountered, and at all times relevant hereto, was acting under the authority and color of law, and acted in concert with one or more of the other individual Defendants in the performance or conduct of their actions, or acted independently of them.

9.    Defendant Officer Christopher Matthews (hereinafter referred to as "Matthews") is an adult individual who, at all times relevant hereto, was serving in his capacity as a sworn officer of the Allentown Police Department, and was entrusted with the power to enforce the laws of the Commonwealth of Pennsylvania and the Ordinances of the City of Allentown.  Defendant Matthews was entrusted with the obligation to protect the Constitutional rights of those he encountered, and at all times relevant hereto, was acting under the authority and color of law, and acted in concert with one or more of the other individual Defendants in the performance or conduct of their actions, or acted independently of them.

10.    Defendant Officer Preet Bajwa (hereinafter referred to as "Bajwa") is an adult individual who, at all times relevant hereto, was serving in his capacity as a sworn officer of the Allentown Police Department, and was entrusted with the power to enforce the laws of the Commonwealth of Pennsylvania and the Ordinances of the City of Allentown.  Defendant Bajwa was entrusted with the obligation to protect the Constitutional rights

6

of those he encountered, and at all times relevant hereto, was acting under the authority and color of law, and acted in concert with one or more of the other individual Defendants in the performance or conduct of their actions, or acted independently of them.

11.    Defendant Officer Scot Walz (hereinafter referred to as "Walz") is an adult individual who, at all times relevant hereto, was serving in his capacity as a sworn officer of the Allentown Police Department, and was entrusted with the power to enforce the laws of the Commonwealth of Pennsylvania and the Ordinances of the City of Allentown.  Defendant Walz was entrusted with the obligation to protect the Constitutional rights of those he encountered, and at all times relevant hereto, was acting under the authority and color of law, and acted in concert with one or more of the other individual Defendants in the performance or conduct of their actions, or acted independently of them.

12.    Defendant Officer Yamil Castillo (hereinafter referred to as "Castillo") is an adult individual who, at all times relevant hereto, was serving in his capacity as a sworn officer of the Allentown Police Department, and was entrusted with the power to enforce the laws of the Commonwealth of Pennsylvania and the Ordinances of the City of Allentown.  Defendant Castillo was entrusted with the obligation to protect the Constitutional

rights of those he encountered, and at all times relevant hereto, was acting under the authority and color of law, and acted in concert with one or more of the other individual Defendants in the performance or conduct of their actions, or acted independently of them.

13.     Defendant(s) John/Jane Does 1-X (hereinafter referred to as "Doe") are adult individual(s) whose identity is presently unknown and, at all times relevant hereto, was/were serving in his/her/their capacity as a sworn officer(s) of the Allentown Police Department, and was/were entrusted with the power to enforce the laws of the Commonwealth of Pennsylvania and the Ordinances of the City of Allentown. Defendant(s) Doe was/were entrusted to protect the Constitutional rights of those he/she/they encountered, and at all times relevant hereto, was/were acting under the authority and color of law, and in concert with one or more of the other individual Defendants in the performance or conduct of their actions, or acted independently of them.

14.     Defendant Mayor Ray O'Connell (hereinafter referred to as "Mayor" or "Mayor O'Connell") is an adult individual who is an elected official of the City of Allentown and is in direct supervision of the Police Department and its sworn members, and also of the selection of supervisory personnel for the Allentown Police Department, who are, in turn, by and through him,

8

responsible for the formulation and/or implementation of practices, policies, customs and procedures, as well as the day-to-day operation and oversight, including command and control, of all segments of the Allentown Police Department. Mayor O'Connell either does, or has failed to, promulgate and enforce laws, rules and regulations concerning the operations of the Allentown Police Department and who at all times relevant hereto, was acting within the scope of his duties and authority, under color or title of state or municipal public law or ordinance, and supervised or controlled one or more of the other Defendants herein, in their conduct or actions, or inactions, or acted in concert with them, in the performance of their conduct or actions. It is believed, and therefore averred that Defendant Mayor O'Connell, exercises/exercised authority over the selection, staffing, retention, training, promotions, discipline and operational functions of the Allentown Police Department, with the final and unreviewable decision making authority of a policymaker.

15. Defendant Former Chief Tony Alsleben (hereinafter referred to as "Chief Alsleben") is an adult individual who, at all times relevant hereto, up until on or about September 6, 2019, was a sworn member of the Allentown Police Department with the rank of Chief who was responsible for the formulation and/or implementation of practices, policies, and procedures,

discipline and assignment of officers, hiring and firing, as well as the day to day operation and overseeing and command and control of all segments of the Police Department, and who at all times relevant hereto was acting within the scope of his duties and authority, under color or title of state or municipal public law or ordinance and supervised or controlled one or more of the other Defendants herein in their conduct or actions, or acted in concert with them in the performance of their conduct or actions, or acted independently.   It is believed, and therefore averred that Defendant Alsleben, along with Defendant Mayor O'Connell, at pertinent times, were the ultimate authorities for the staffing, promotions, discipline and/or operational functions of the Allentown Police Department, with the final and unreviewable decision-making authority of policymakers.

16.   Defendant City of Allentown (hereinafter referred to as the "City") is a municipal corporation, City of the Third Class, and governmental entity within the Commonwealth of Pennsylvania, empowered to establish, regulate, and control its Police Department for the enforcement of laws and ordinances within its jurisdiction, and for the purpose of protecting and preserving the persons, property and the Constitutional rights of individuals within the geographical and legal jurisdiction of the Defendant City.

## III.    PRE-DISCOVERY FACTUAL ALLEGATIONS

17.    On September 8, 2018 at approximately 1:30 a.m., Plaintiff John Perez was
        in his residence at 747 South Filmore Street, Allentown, PA 18103,
        watching a movie with his 2-year-old niece.

18.    Perez lived at this residence with his uncle, aunt, and four (4) nephews and
        nieces.

19.    On that same date, at approximately 1:45 a.m., the Defendant Officers
        (with the exception of the Chief), and other members of the APD arrived
        in the alleyway behind the Perez residence in response to a call from a
        citizen that an armed man was seen in the vicinity.

20.    Shortly after the APD officers arrived, it was determined that if there was
        an armed man, he had departed the area.  However, the APD officers used
        the pretext of the citizen's call to begin unlawful searches of private
        garages.

21.    Neighbors of Perez, who appeared in the alleyway and witnessed the
        officers unlawful conduct, questioned the APD officers about their actions.
        The questions, which the citizens were justifiably asking, resulted in
        various officers, including Defendant Officer Battoni, to direct obscenities
        and other offensive words towards the neighbors, including referring to

them as "babies" and "bitches", and mocked one of the neighbors, stating, "you ran like a little baby, little baby, little bitch."

22. Battoni also threatened the neighbors that he would return to the area, and cautioned them, "you don't want me back."  This area of Allentown is not within the routinely assigned area of patrol for Battoni and is predominantly Latino, as was evident from the neighbors who gathered.

23. While the foregoing was occurring, from the bedroom, Perez heard the commotion coming from his back of the house towards the alleyway where the officers and neighbors had congregated.

24. Perez went downstairs to see what was going on and could hear yelling and cursing.

25. After he walked outside, Perez saw and heard Defendant Officer Vernon calling his neighbors "4th Street Pussies", "Corn Street Pussies", and "bitches".

26. Perez stated to Vernon, "that's how you conduct yourself.  That's how you talk to people?  If you're here to help us, why are you screaming at everybody that called the cops.  Why are you talking to them like that if you're here to help them."

27. Defendant Officer Lebron who was standing nearby yelled at Perez to "mind your f**king business" and taunted Perez saying, "you're a buck

five [105 pounds] soaking wet.  Get the f**k out of here.  Go back to where the f**k you came from."

28.    Clearly, words such as these are threatening and constitute conduct unbecoming of an officer, and have become a hallmark of how the APD treats citizens of the City of Allentown, especially minority citizens.

29.    Although Perez was born in the United States and is a U.S. citizen, his parents had immigrated to the United States from the Dominican Republic, and his appearance is consistent with that heritage.

30.    The words of Lebron were intended to offend and disparage Perez, but Perez did not direct anger or any violence towards Lebron in return, but instead simply replied, "why are you speaking to me like that."  Lebron again stated, "you're a buck five soaking wet.   Mind your f**king business."

31.    Rather than physically reacting to Lebron's taunts, Perez told Lebron that he was a man like Lebron, that Lebron should not speak to him like that, and because there were obviously children about, Perez added, "this is how you officers talk around kids"?

32.    Lebron then, with quick and explosive force, using both hands, violently pushed Perez to the ground, causing Perez' neck to whip back and for him to fall on his back, unable to protect himself during the fall.

13

33.    Recognizing that he was in a physically vulnerable position, Perez quickly stood back up, and Lebron, without cause and in a violent rage attacked him, striking him repeatedly with full force fists to Perez' face and body, and striking Perez forcefully in his abdomen and face with his knee.

34.    Battoni, Smith, and Matthews joined in on the unprovoked and criminal assault, upon Perez who did not do anything but attempt to shield himself from the brutal attack.

35.    Battoni delivered at least five (5) uppercut blows to Perez' face.

36.    At this time, instead of intervening in Lebron and Battoni's unprovoked assault upon Perez, Defendants Smith and Matthews assisted in the physical assault by restraining Perez, rendering Perez unable to protect himself from the continuing strikes and blows by Lebron and Battoni, causing Perez further injuries.

37.    A dazed and injured Perez was then handcuffed behind his back and one of the officers led him to the back of the police van and slammed Perez' chest into the back of the van, in a clear effort to place an exclamation point on the assault upon Perez.

38.    At no time did Perez strike, kick, punch, or push any officer.

39. At no time did Perez commit any criminal offense, nor did his polite and reasonable conduct justify any use of force by any officer, most especially the violent assault that occurred.

40. At no time prior to, or during the assault, did any officer advise Perez that he was under arrest.

41. During the assault, neighbors screamed at the Defendant Officers to stop, yelling, "they're beating him. They hit him, he didn't do anything."  And, yet, the assault continued.

42. Defendants Bajwa, Vernon, Walz, Castillo and Does were present for, and in close proximity to, the assault of Perez and failed to intervene, in any way, even though they had the clear opportunity, and it was their duty as police officers to do so.  Several of these Defendants, were in fact, complicit in that they used the flashlights on their cellphones to shine bright lights into the cellphones of neighbors to prevent them from video recording the brutal assault on Perez.

43. The force employed by Defendants was unreasonable and excessive, and totally unwarranted and unnecessary, and caused serious pain and suffering, and permanent damage to Perez.

44. Perez provided no threat or resistance to the Defendants when the Defendants decided to assault him, arrest him, and place him into custody.

45.    Many of the officers intentionally turned off or disconnected their body-cams to avoid memorializing the horrific assault upon Perez.  However, unknown to the police and the Defendants at that time, was the fact that a home owner's surveillance camera in the alleyway captured the assault on Perez.

46.    Defendant Lebron then swore out a false Police Criminal Complaint against Perez charging him with the fabricated crimes of "Resisting Arrest," an alleged violation of Section 5104 of the Pennsylvania Crimes Code, and "Disorderly Conduct – Threatening Behavior", a Summary Offense under Section 5503(a)(1) of the Pennsylvania Crimes Code.

47.    Perez was arraigned by Magisterial District Judge Karen C. Devine at 10:02 a.m. that same morning and was remanded to prison in lieu of being able to post bail, which was set in the amount of $5,000.00, cash.

48.    Perez eventually was able to post bail and was released on September 8, 2018, spending hours in unlawful custody.

49.    In addition to Defendant Lebron's intentionally false filed Sworn Affidavit and Criminal Complaint, all Defendant Officers involved in the incident likewise filed false and/or intentionally incomplete reports (or filed no reports), to further cover-up the assault, manufacturing inculpatory facts, and omitting true material facts, as well.

50.    Defendant Officers had the duty as APD police officers to report the true nature of their unwarranted assault upon Plaintiff but did not, in order to cover-up the illegal and unconstitutional conduct and to pervert the judicial process.

51.    As a result of the criminal assault by the Defendants, Perez' arm was dislocated, his nose was broken, he had a large gash in his forehead, he could hardly breathe after the assault, and endured other serious pain and discomfort throughout his body.

52.    The next morning when Perez urinated, he passed blood in his urine.

53.    Perez has permanent scarring on his face from the assault, and continues to experience pain, is limited in his activities, has difficulty performing certain labors, and both his pain and his limitations may be permanent in nature.

54.    Perez' physical injuries included, *inter alia*; injuries to his head, face, shoulders, arms, stomach, back, hip, and wrists.

55.    Perez required medical treatment and may continue to require medical treatment into the indeterminate future, with some issues potentially being permanent in nature.

56.    Due to the events of that night, Perez has also suffered serious psychological damage, which requires treatment, continuing into the indeterminate future.

57.    It is believed that the APD Internal Affairs Division ("IA"), and/or Office of Professional Standards ("OPS") which are responsible to investigate all use of force incidents by police, did not conduct a thorough and objective investigation into the assault upon Perez, even after a video of the assault had gone viral.  And, in fact, the would be investigators actually assisted in the cover-up by continuing the charade that Perez was an assaultive resistor, when they well knew, and should have known through minimal investigation, that Perez was a defenseless victim of an unconstitutional police assault, among other Constitutional violations.

58.    It is believed that one or more the Defendant Officers have a history of violence and Constitutional violations that were known to their supervisors, policy-makers, and Defendant City.  This history has gone undisciplined and, in essence, the Defendants' past actions were condoned and encouraged by their supervisors and the City, leading to the Constitutional violations complained of in this action.

59.    Equally telling is the fact that, of the numerous investigations which were supposedly conducted into APD Officers' misconduct over the last years,

it is believed and therefore averred, that <u>none</u>, with the exception of the Ryan Alles' criminal prosecution, were determined to be founded, when some, at least, clearly warranted disciplinary action, termination, and/or retraining, and no such action resulted.

60. Defendant Officer Lebron, in particular, has had a prior civil rights case brought against him for the excessive use of force on a minority member of the community, and has a well-deserved reputation for the unnecessary, unreasonable and excessive use of force.

61. No discipline of any kind was imposed upon the instant Defendants, nor any other of the APD personnel that assisted in covering up the clearly unconstitutional conduct against Perez.

62. The Internal Affairs Division of the APD engaged in only a superficial, pro forma investigation, and a cover-up, of both Lebron's prior assault and the instant assault.

63. No appropriate investigation was undertaken, no discipline was issued, and no retraining was ordered, by Mayor O'Connell, Chief of Police Defendant Alsleben, or any supervisor regarding the clear Constitutional violations committed by the Defendant Officers against Plaintiff.

64.   In fact, not one of the Defendant Officers sought to identify or interview a single civilian/neighbor or other witness, in an effort to record and report their observations concerning the incident and the assault on Perez.

65.   Also, no APD detective, supervisor, member of APD, including Internal Affairs, nor any independent person or body, interviewed one civilian/neighbor witness to record and report their observations concerning the incident and the assault on Perez.  Instead, the supervisors and IA officers simply accepted the Defendant Officers' version of the incident, no matter what the actual truth.

66.   The Defendant Officers believed at the time of the assault and arrest of Perez that their story would be taken as true by their supervisors because they believed that they had made certain that there was no video recording of exactly what they did to Perez.

67.   Post incident, the Defendant Officers continued to act with impunity because they were not aware of the fact that a surveillance camera on one of the residences in the alleyway recorded the unprovoked and savage attack on Perez.

68.   The Defendant Officers only learned of the video after they had already prepared false police reports, and after Lebron had prepared a false Sworn Affidavit to a Criminal Complaint charging Perez, when the Morning Call

newspaper in Allentown obtained a copy of the video recording and made it public on September 8, 2018.

69.    Only after this public reporting, and related uproar, did APD Internal Affairs conduct interviews of some of the Defendant Officers.  These interviews were audio and video recorded.

70.    During these interviews, even in the face of the surveillance video, including some officers' body cam footage, IA investigators simply accepted as true the false accounts of the Defendant Officers.  They intentionally went off the record when the video was shown to the officers. No questioning of the Defendant Officers, and no comments regarding what was captured on film, nor the officers' justification for their conduct, was recorded by IA.  One of the recorded interviews of a Defendant Officer, however, establishes, at a minimum, that IA personnel coached the officer off video.

71.    Even following the public release and public uproar over the contents of the video recording, IA conducted no investigation and wrongfully and summarily determined falsely that the force used by the Defendant Officers was justified.

72.    This lack of an appropriate, independent and objective investigation and lack of any subsequent discipline or corrective action is a long-standing

practice and custom of APD, and further evidences that supervisors and decision-makers such as Defendants O'Connell and Alsleben, were not only deliberately indifferent to violations of citizens' Constitutional rights, but actually condoned, if not encouraged, same, and, that they had become a custom or *de facto* policy within the Police Department.

73. The Allentown Police Department and City of Allentown provided inadequate training and no remedial training to Defendants pertaining to the appropriate use of force to employ in circumstances such as those presented *sub judice*; de-escalation and unlawful searches; concerning when and how to effect an arrest and initiate a prosecution; citizen interactions including those involving minorities; crowd control; when and how to intervene to stop unlawful use of force by a fellow officer (like that which the Defendants encountered on the night in question); and, the importance of rendering truthful, independent and complete reports and affidavits.

74. Upon information and belief, members of the Allentown Police Department generally, and routinely, used excessive force in the performance of their duties, and with perhaps a single exception, no disciplinary action was taken in any of those instances.

75.    Prior to the incident giving rise to Perez' Complaint, the written policies that existed regarding the appropriate use of force to be utilized in circumstances akin to those encountered here, and commonly encountered by law enforcement, were routinely ignored and this abuse was accepted as the common practice and custom within the Department.

76.    Despite repeated incidents/complaints of excessive use of force committed by Allentown Police Officers, especially against minorities, no significant efforts were made to establish or ensure actual proper use of force standards were promulgated, disseminated and enforced within the Police Department. No efforts were made to ensure citizens' Constitutional rights were not violated. And, no cultural bias/sensitivity reviews or remedial training was implemented.

77.    The Internal Affairs division routinely operated, not to make legitimate inquiry into police wrongdoing, but as a vehicle to cover-up, falsely justify, defend from litigation, and otherwise exonerate police misconduct, thereby ensuring its perpetuation.

78.    This custom and *de facto* policy supported an ongoing culture within the Allentown Police Department which not only condoned, but encouraged, the sort of constitutional violations which occurred here, with each Defendant knowing that his conduct would go unpunished and undeterred.

79.    At the jury trial of Perez in February 2020, Defendants Lebron, Battoni, Vernon, and Bajwa also presented false testimony under oath to conceal the unlawful assault on Perez, in the effort to convict and imprison him, which conduct is itself a criminal offense.

80.    After Battoni testified falsely against Perez, he was met in the courthouse corridor by Lebron and they "high fived" each other over the believed success of the false testimony of Battoni, clearly making a mockery of the judicial system, and evidencing their belief that because they wear a badge, they are untouchable.

81.    The jury acquitted Perez of all charges.

82.    After the verdict the trial judge made certain factual findings concerning the Commonwealth's case and the Defendant Officers who testified, including, *inter alia*, that Defendants Lebron, Battoni, Vernon, and Bajwa perjured themselves; that they escalated a situation without cause; and that their conduct during the trial process was simply reprehensible, including their lying under oath, their smirking on the witness stand at the jury; their laughing at the defense attorney; and, their high fiving in the hallway after their presentation of knowingly false sworn testimony (for full text see Exhibit "A").

83. Following those comments, various Defendant Officers acted swiftly and improperly to lobby their police union representatives to retaliate against the trial judge and to demand that the President Judge of Lehigh County remove Perez' trial judge from presiding over "all cases involving members of the Allentown Police Department."

84. The President Judge determined that the trial judge acted properly in making her findings and rejected the Defendants' attempt to have their police union intimidate the independent Judiciary.

85. This effort by the Defendant Officers and their union was an affront to the separation of the executive and judicial branches of government, and evidences the brazen effort by these Defendants, and their accomplice union representatives, to keep in place, a seriously flawed and unsupervised and wholly indifferent police department and City administration.

86. These actions were done without any effort by the union, Mayor O'Connell or the Chief of Police at the time of the trial, Glenn Granitz, Jr., to investigate the conduct of the Defendant Officers at trial to determine if the Judge's remarks were, in fact, correct and supported by the evidence.

87. This effort to retaliate against the trial judge and to ignore the need to investigate the Defendant Officers' trial testimony and conduct establishes

25

the continued deliberate indifference of the City of Allentown, its policy makers, and police supervisors, to the conduct of its police officers and the Constitutional violations they continue to engage in - to the great and lasting detriment of the City's citizenry.  This was not the only time that a judge has alerted the City, its police department and its policy-makers and supervisors to serious and systemic deficiencies within the City, its police department and personnel – and, not the first time that judicial has been directly ignored.

88.    The effort to retaliate against the trial judge was made even though the City of Allentown and its Mayor and Police Chief learned in April 2019, during the civil rights trial of *Charlene Klein v. City of Allentown, et al.*, No. 17-4507, that a jury in the Eastern District of Pennsylvania had awarded significant monetary damages, including punitive damages, against the police chief and APD officers for the use of excessive force and other violations against a citizen of Allentown which the jury, by its verdict, found to be outrageous and unacceptable in a civilized society.  By this verdict, the jury rejected the sworn testimony of the police witnesses, and found that the five (5) Defendant Officers, which included the Chief of Police at the time, conduct was willful, wanton, and worthy of multiple

awards of punitive damages intended to deter any future acts of excessive force by members of the APD.

89.     Despite this chastising jury verdict, no discipline, retraining, or action of any kind was taken against the particular APD Officers in that case or, the Department in general.

90.     Defendants O'Connell and the present Police Chief acquiesced in the abhorrent conduct of the Defendant Officers and union representatives in retaliating against the trial judge and in their failure to investigate, signaling their consent that unlawful, unconstitutional and inappropriate business as usual would sadly continue in the APD.

91.     Despite the evidence established at the Perez trial, the verdict of the jury, and the findings of the trial court, there has never been a fair or complete investigation by the City of Allentown or its police department into the conduct of the Defendant Officers on September 8, 2018 or their false reports and trial testimony performances.

92.     In fact, neither the Defendant City of Allentown, its Defendant Chief of Police, nor the Defendant Mayor took any action against the Defendant Officers who received no discipline, reprimand, or retraining following the assault on Perez, the fabrication of a Criminal Complaint, the false swearing of the attached Affidavit, the falsification and fabrication of

police reports, the Defendant Officers' trial perjury, the verdict exonerating Perez, and the scathing findings by the Court.

93.   Nor did the Defendant City of Allentown, its Defendant Chief of Police, or the Defendant Mayor take any action (1) against each other – *inter se*; (2) to correct, modify, remediate or eliminate any policy, practice, procedure, rule, General Order or custom which allowed for, or even encouraged, the Officers' unconstitutional and criminal actions outlined by the Judge; or (3) to even investigate the incident given the Court's extremely serious pronouncements concerning the Defendant Officers' conduct.

94.   There can be no greater proof of the City's continuing pattern of deliberate indifference to the Constitutional rights of its citizens, than its tacit approval and acceptance of the Defendant Officers' above-described conduct as an approved custom or policy of the City, than its turning a blind eye to the Trial Court's on-the-record observations – especially in view of their wide dissemination by the media.

95.   At all times relevant hereto, the legal principles regarding the rights of persons, such as Perez, to be free from the excessive use of force by a police officer, to be free from malicious prosecution, to be free from unlawful seizure, to the due process of law, as well as the contours of those

28

Constitutional and statutory rights, were well established, and it was not reasonable for the Defendants to believe that their actions would not deprive the Plaintiff of those rights.

96. The actions of the Defendants violated the clearly established and well-settled federal Constitutional rights of Plaintiff as more clearly set forth in the Counts below.

97. Perez did not physically resist, threaten, or assault the Defendants in any way, and the force used against Perez was totally and completely unnecessary, unreasonable, excessive and outrageous, warranting the award of both compensatory and punitive damages against the Defendant Officers in their individual capacities. And, given the fact that the amounts awarded in the *Klein* case did not serve as an effective deterrent to the City, the Mayor, its Police Department or its police officers, it is clear that amounts many times a multiple of the prior punitive damage verdicts must be awarded if such a verdict is to achieve its intended deterrent effect.

98. At no time during the events described above was Perez a threat to the safety of himself or others. To the contrary, he was peacefully and lawfully on a public street, expressing his First Amendment Constitutional right, which he was lawfully permitted to do.

99.  The Defendant City of Allentown, acting through its policy makers, and supervisors, routinely ignored citizens' complaints of officers' violations of citizens' Constitutional rights.  In effect, it was communicated to the Department, and the public, that any attempt to reform the Department would be ineffectual and that the custom and practice of inflicting Constitutional abuses by members of the Allentown Police Department would remain intact.

100.  The Allentown Police Department's citizen complaint protocol intentionally and systematically cleanses and under-reports police abuse complaints by the citizenry, even as it institutionally deters them from being made; and, even as it ignores them when made.

101.  Moreover, the APD's General Order's definition of "complaint" is so narrowly construed as to virtually eliminate from its definition any and all claims concerning the excessive use of force, and these complaints are systematically excluded from departmental statistics, even if kept as required:

> "Non-complaints" are defined as those which result in potential civil liability as a result of any use of force by police officers, including especially reported excessive use of force."

102. In fact, the APD adopted General Orders and policies which themselves established the Department's deliberate indifference to the Constitutional rights of citizens like the Plaintiff.

103. One example is Subsection 2.5.11 E of the Allentown Police Department General Order 2.5 which expressly provides that Allentown police officers should investigate physical force complaints with the express purpose, not of determining whether a citizen's Constitutional rights have been violated, but solely to assist the Department in the <u>defense</u> of any claimed misconduct:

> (1) "Incidents involving …. use of physical force provide a high potential for liability to the Department and its personnel.  In all such incidents, ***an immediate investigation shall be conducted into factual circumstances surrounding the incident to assist the Department in developing legal theories that can be advanced in defense of any resulting claims***, and to properly evaluate the potential for liability to which the Department or its members could be exposed."

104. In other words, the Allentown Police Department and the City of Allentown have an actual, written policy which has as its goal, not the objective investigation and/or vindication of citizens' complaints (especially those involving the use of force) or truth-finding, but the defending and "clearing" of the City and its officers accused of wrongdoing from any potential liability at the hands of a jury.

105.   Furthermore, this same General Order is so deliberately indifferent to the Constitutional rights of any citizen who has claimed to have been the victim of excessive use of force that, the Order does not require, or even encourage, any interview of the victim of the excessive use of force, leaving abusive officers free to unabashedly manufacture any details which exonerate them, without fear of contradiction:

> (10) "During the investigation of a non-complaint incident, the investigator shall exercise discretion in determining if an aggrieved citizen should be interviewed." 2.5.11 E.

106.   The Allentown Police Department and the City of Allentown, intentionally, and with deliberate indifference, by policy, discourage complaints, do the absolute minimum investigation, including, *inter alia*, refraining from interviewing key witnesses, neglecting to obtain and review video surveillance, and, instead, actively assisting in creating a story to justify the officers' violations.

107.   In effect, the Allentown Police Department and the City of Allentown, acting through its policy-makers and supervisors, have institutionalized a policy to cover-up police wrongdoing, or at the very least turn a blind eye toward the wrongdoing, sending a message to both the Department and the public at large, that Constitutional violations will not only go unpunished

but will be tolerated, if not encouraged by the City and the police administration.

108. This constitutes deliberate indifference *per se* and a complete abdication of supervisory and decision-making responsibility.

109. The City, the Mayor, the APD, and Chief Alsleben, among other decision makers and supervisors, failed to adopt and enforce reasonable and necessary policies and procedures to end the culture of abuse and of deliberate indifference to the rights and safety of citizens that had become the long-standing hallmark of the Allentown Police Department. The Defendants herein continued to encourage this custom and practice of deliberate indifference to the Constitutional rights of others by ignoring and even rewarding inappropriate actions, by failing to promulgate appropriate rules, regulations and policies; by failing to enforce existing rules and regulations; by failing to discipline; by inappropriate hiring, training, supervision and promotional practices; and by reinforcing the old culture of deliberate indifference, especially in the face of continued and blatant Constitutional and criminal acts.

110. At all times during the events described above, the Defendant Officers were engaged in a joint venture. These individual Defendants assisted each other in performing the various actions described, and lent their

physical presence, support and the authority of their office to each other during the said events.

111.   As a direct and proximate result of the said acts or omissions of the Defendant officers, made possible by, and compounded by, the acts and/or omissions of other Defendants, the Plaintiff suffered, *inter alia*, the following injuries and damages, some or all of which may be permanent in nature:

    i.   physical and mental pain and suffering, in both the past and the predictable future, including discomfort, loss of use of bodily function, ill health, loss of sleep, and other emotional injuries including stigma, humiliation, distress, fright, PTSD and emotional trauma;

    ii.   medical and psychological expenses, past and future;

    iii.   loss of life's pleasures;

    iv.   legal expenses for the defense of the unlawfully instituted criminal charges, and expungement of this unlawful arrest from his records;

    v.   general damages for violation of Plaintiff's Constitutional rights under the Fourth and Fourteenth Amendments to the United States Constitution and Article 1, Section 8 of the Pennsylvania Constitution; and

vi. punitive damages (except as to the City and the Defendants in their official capacities), which are justified factually as alleged herein, and legally, because the Defendants acted maliciously and/or wantonly in violating the Plaintiff's Constitutionally (federal and state) protected rights, and intentionally, recklessly and willfully engaged in reprehensible and outrageous conduct not to be tolerated in a civilized society.

112. Plaintiff further seeks counsel fees and costs as authorized by statute.

113. The actions of the Defendants violated the clearly established and well-settled federal Constitutional rights of Perez and, it would be unreasonable for any Defendant to believe that they were not violating such rights as more clearly set forth in the Counts below.

114. Perez believes, and thus avers, that without the intervention of this Honorable Court, Perez in particular, as well as others, is likely to suffer damages from similar violations of his Constitutional rights in the future, requiring injunctive relief.    This belief is further supported by the Defendants' strident failure to change following similar adverse verdicts and judicial criticisms in the past.

115. The Defendants, individually and collectively, at all times pertinent to the claims asserted herein, acted under color of state law.

116. While acting under color of state law, the Defendants deprived Perez of various state and federal Constitutional rights as more fully set forth herein.

<u>**COUNT I**</u>
**42 U.S.C. § 1983**
**Excessive Force**
***Against Individual Defendants Lebron, Battoni, Smith, Matthews, and John and Jane Does***

117. The preceding paragraphs are incorporated herein by reference as though fully set forth.

118. The Plaintiff was subjected to a seizure within the meaning of the Fourth Amendment through the application of force.

119. The application of force against the Plaintiff was unreasonable under the circumstances and unconstitutionally excessive.

120. The Fourth Amendment to the United States Constitution protects persons from being subjected to excessive force while being arrested even if the arrest is otherwise proper.

121. The named Defendant Officers used excessive force in the arrest of the Plaintiff in that there was absolutely no need for the application of any force, and in view of the fact that the amount of force actually used by the Defendants exceeded the amount of force which a reasonable officer would have used under similar circumstances, and force of a kind which

violated the Allentown Police Department's own policies, deficient as they may otherwise be.

122. Accordingly, no physical force of any kind, was required or should have been employed against Plaintiff here.

123. The Plaintiff did not present any threat to the Defendants nor any other persons or property at the time he was assaulted.

124. Defendants used excessive force in their encounter with the Plaintiff when Defendant Lebron pushed Plaintiff violently to the ground, and as Plaintiff stood back up, the defendant Officers beat the Plaintiff using their fists and knees, while taking the Plaintiff to the ground, handcuffing him behind his back, and then slamming him into the back of a police van.

125. The use of force was not reasonable under the Constitution where, as here, there was no need for any force at all, and most especially the force that was used.

126. The nature and degree of excessiveness utilized against the Plaintiff by Defendants was outrageous, reprehensible, malicious, vicious, intentional, and malevolent, and clearly warrants an award of punitive and compensatory damages.

127.    As a result of the excessive use of force employed against the Plaintiff in violation of his Fourth Amendment rights, the Plaintiff suffered damages as stated herein.

128.    Defendant Officers are liable for their personal involvement in the commission of the acts complained of here.

129.    Defendant Supervisors and Policymakers are liable for the acts of Defendants pursuant to the claims of Supervisory and Policymaker liability, expressly set forth herein, and which are incorporated by reference as if set forth *et extenso* here.

130.    Defendant, the City of Allentown, is liable for the acts of Defendants pursuant to the claims of Municipal (*Monell*) Liability, expressly set forth herein, and which are incorporated by reference as if set forth *et extenso* here.

131.    Further, the conduct exhibited by subordinate municipal officers and employees, which occurred on September 8, 2018 was not unexpected. Neither were they the deeds of independent, non-supervisory actors. But, rather, they constituted predictable behaviors of subordinates who operated with perceived impunity due to the deliberate indifference of their supervisors and policymakers, and their joint policies, practices and customs, which operated as the moving force behind what the Officers

believed to be their unaccountable efforts to engage in what had become, all too customary, Constitutional deprivations.

132.    The likelihood is that, but for the alleged acts and omissions committed by the other Defendants, the injuries inflicted upon the Plaintiff would not have occurred.

**WHEREFORE,** Plaintiff respectfully requests that this Honorable Court award judgment in Plaintiff's favor and against the aforesaid Defendants, jointly and severally, in an amount in excess of the One Hundred Fifty Thousand Dollar ($150,000.00) limit for arbitration in the Federal District Court for the Eastern District of Pennsylvania, together with punitive damages against Defendants in their individual capacities, injunctive relief, attorneys' fees and costs, and such other relief which the Court may find appropriate.

<u>**COUNT II**</u>
**42 U.S.C. § 1983**
**Failure to Intervene**
***Against Individual Defendants Lebron, Battoni, Vernon, Smith, Matthews,***
***Bajwa, Walz, Castillo, and Does***

133.    The preceding paragraphs are incorporated herein by reference as though fully set forth.

134.    Each of the Defendants are liable for failing to intervene to prevent the assaults upon Plaintiff and the Constitutional violations of Plaintiff's federally protected rights, at the hands of the other Defendants.

135.   Plaintiff's Constitutional rights were violated as alleged herein.

136.   Under the aforestated circumstances, whether Defendants were or were not themselves violating Plaintiff's rights, they had the duty to intervene, including the duty to intervene to prevent the use of excessive force by Defendants Lebron, Battoni, Smith, Matthews, and Does upon Plaintiff, if they had a reasonable opportunity to do so.

137.   The events described took place over a sufficiently extended period of time that the Defendants had a realistic and reasonable opportunity to intervene.

138.   Defendants failed to intervene in any and all the unconstitutional assaults upon the Plaintiff.

139.   Accordingly, Defendants Vernon, Bajwa, Walz, Castillo, and Does (and Lebron, Battoni, Smith, and Matthews vis-à-vis each other) are liable for all the harm, and hence damages, suffered by the Plaintiff, as stated herein.

140.   The likelihood is that, but for the alleged acts and omissions committed by Defendants, the injuries inflicted upon the Plaintiff by other Defendants would not have occurred.

141.   Defendants are jointly liable for their personal involvement in the commission of the acts complained of here.

142.   Defendant Supervisors and Policymakers are liable for the acts of Defendants pursuant to the claims of Supervisory and Policymaker liability,

expressly set forth herein, and which are incorporated by reference as if set forth *et extenso* here.

143.    Defendant, the City of Allentown, is liable for the failure to intervene by Defendant Officers pursuant to the claims of Municipal (*Monell*) Liability, expressly set forth herein, and incorporated by reference as if set forth *et extenso* here.

**WHEREFORE,** Plaintiff respectfully requests that this Honorable Court award judgment in Plaintiff's favor and against the aforesaid Defendants, jointly and severally, in an amount in excess of the One Hundred Fifty Thousand Dollar ($150,000.00) limit for arbitration in the Federal District Court for the Eastern District of Pennsylvania, together with punitive damages against Defendants in their individual capacities, injunctive relief, attorneys' fees and costs, and such other relief which the Court may find appropriate.

<u>**COUNT III**</u>
**42 U.S.C. § 1983**
**Unlawful Seizure / False Arrest**
***Against Individual Defendants Lebron, Battoni, Vernon, Smith, Matthews, Bajwa, Walz, Castillo, and Does***

144.    The preceding paragraphs are incorporated herein by reference as though fully set forth.

145.    The conduct of the Defendant Officers constituted an unlawful arrest and seizure of the Plaintiff, within the meaning of the Fourth Amendment, in

41

that he experienced, *inter alia*, an unreasonable deprivation of his freedom of movement.

146.  Said arrest and seizure was unreasonable and without probable cause in that the facts and circumstances available to the Defendants would not warrant a prudent officer in believing that the Plaintiff had committed or was committing a crime, which would justify their arrest or seizure.

147.  The Plaintiff was subjected to the unlawful seizure and arrest in violation of the Fourth Amendment of the United States Constitution.

148.  As a result of the unlawful seizures and false arrests affected upon the Plaintiff, the Plaintiff suffered damages as stated herein.

149.  The Defendant Officers are personally liable for their direct involvement in the commission of the acts complained of here.

150.  The City, its Mayor and police supervisors are liable for the acts of these Defendants pursuant to the claims and theories expressly set forth hereinafter, and which are incorporated by reference as if set forth *et extenso* here.

151.  Further, the conduct exhibited by the subordinate Defendant officers, which occurred on or about September 8, 2018, and thereafter, were not unexpected.  Neither were they the deeds of independent, non-supervisory actors.  But, rather, they constituted predictable behavior of subordinates

who operated with perceived impunity due to the deliberate indifference of their supervisors and policymakers, and the joint policies, practices and customs, of the City and its Mayor which operated as the moving force behind what the Defendant Officers believed to be their unaccountable efforts to engage in what had become, all to customary, Constitutional deprivations within the Allentown Police Department.

152.    The likelihood is that, but for the alleged acts and omissions committed by the City and its Mayor, the injuries inflicted upon the Plaintiff would not have occurred.

**WHEREFORE,** Plaintiff respectfully request that this Honorable Court award judgment in Plaintiffs' favor and against the aforesaid Defendants, jointly and severally, in an amount in excess of the One Hundred Fifty Thousand Dollar ($150,000.00) limit for arbitration in the Federal District Court for the Eastern District of Pennsylvania, together with punitive damages against Defendants in their individual capacities, injunctive relief, attorneys' fees and costs, and such other relief which the Court may find appropriate.

## COUNT IV
### 42 U.S.C. § 1983
### False Imprisonment and/or Detention
### *Against Individual Defendants Lebron, Battoni, Vernon, Smith, Matthews, Bajwa, Walz, Castillo, and Does*

153. The preceding paragraphs are incorporated herein by reference as though fully set forth.

154. The Defendant Officers either individually, or acting in concert, subjected the Plaintiff to false imprisonment in violation of his Constitutionally protected Fourth Amendment rights.

155. The Defendants deliberately arrested, and deliberately detained, the Plaintiff in custody.

156. Said detention was unlawful because it lacked probable cause.

157. The facts and circumstances, which were within the knowledge of the Defendants at the time of Plaintiff's arrest, were not sufficient to warrant a man of reasonable caution to believe that the Plaintiff had committed or was committing a crime for which an arrest and imprisonment was authorized under the law.

158. As a result of being subjected to False Imprisonment, in violation of his Constitutionally protected rights under the Fourth Amendment, Plaintiff suffered the damages alleged herein.

159. The City and its Mayor are liable for the acts of the Defendant Officers pursuant to the claims and theories expressly set forth hereinafter, and which are incorporated by reference as if set forth *et extenso* here.

160. Further, the conduct exhibited by the subordinate Defendant Officers, which occurred on or about September 8, 2018, and thereafter, were not unexpected. Neither were they the deeds of independent, non-supervisory actors. But, rather, they constituted predictable behavior of subordinates who operated with perceived impunity due to the deliberate indifference of their supervisors and policymakers, and the joint policies, practices and customs, of the City and its Mayor which operated as the moving force behind what the Defendant Officers believed to be their unaccountable efforts to engage in what had become, all to customary, Constitutional deprivations within the Allentown Police Department.

161. The likelihood is that, but for the alleged acts and omissions committed by the City and its Mayor, the injuries inflicted upon the Plaintiff would not have occurred.

**WHEREFORE,** Plaintiff respectfully request that this Honorable Court award judgment in Plaintiff's favor and against the aforesaid Defendants, jointly and severally, in an amount in excess of the One Hundred Fifty Thousand Dollar ($150,000.00) limit for arbitration in the Federal District Court for the Eastern

District of Pennsylvania, together with punitive damages against Defendants in their

individual capacities, injunctive relief, attorneys' fees and costs, and such other relief

which the Court may find appropriate.

**COUNT V**
**42 U.S.C. § 1983**
*Malicious Prosecution*
*Against Individual Defendants Lebron, Battoni, Vernon, Smith, Matthews,*
*Bajwa, Walz, Castillo, and Does*

162.    The preceding paragraphs are incorporated herein by reference as though

fully set forth.

163.    As stated hereinbefore, on September 8, 2018, Lebron completed a false

Criminal Complaint and Affidavit of Probable Cause wrongfully charging

Perez with the fabricated criminal offenses of Resisting Arrest (18 Pa.

C.S.A. § 5104), a Misdemeanor of the 2nd Degree and punishable by up to

2 years imprisonment and a $5,000 fine; and Disorderly Conduct (18 Pa.

C.S.A. § 5503 (a)(1)), a Summary Offense.  When Perez challenged these

offenses at his Preliminary Hearing, the prosecuting attorney and Lebron

increased the Disorderly Conduct, charged as a Summary Offense, into a

Misdemeanor of the 3rd Degree and punishable by up to 1 year

imprisonment and a $2,500 fine.

164. On September 8, 2018, the Criminal Complaint and Affidavit of Probable Cause were sworn to and presented by Lebron to Magisterial District Judge Karen C. Devine.

165. The facts in the Affidavit were sworn to by Lebron under the penalty of perjury, and as a direct result of Lebron's knowingly false and misleading averments, the aforementioned formal criminal charges were instituted against Perez.

166. Due to the fabricated criminal charges Perez was forced to retain private criminal defense counsel at significant expense to defend the unjust charges.

167. On February 21, 2020, a unanimous jury found the Plaintiff not guilty of all charges.

168. The Defendants violated the Plaintiff's Fourth Amendment rights by wrongfully initiating the prosecution of Plaintiff for the above-referenced crimes.

169. The aforesaid criminal prosecution was designed, procured, facilitated, and promoted by the Defendants as a pretext, defense and unwarranted justification for the Defendants' unlawful and un-Constitutional violation of the Plaintiff's state and federally protected Constitutional rights.

170. The Defendants lacked probable cause to initiate the said criminal proceeding against the Plaintiff.

171. The criminal proceeding in the case ended in Plaintiff's favor.

172. The Defendants acted maliciously, as stated, or for a purpose other than bringing the Plaintiff to justice, to wit, and in pertinent part, for purposes of justifying and/or covering-up their unconstitutional abuses.

173. The Plaintiff spent time in custody, and otherwise suffered a significant deprivation of liberty as a result of the Defendants' malicious bringing of the unjust and unfounded criminal charges.

174. As a direct and proximate result of the malicious bringing of criminal charges against the Plaintiff he suffered some or all of the damages set forth herein, including especially, legal fees and costs payable for his defense, costs of bail, lost income, shortening of economic horizons as well as humiliation, anxiety and mental anguish associated with knowing that he could be subjected to three (3) years in prison on the unfounded charges.

175. Defendant Officer Lebron is liable for his personal involvement in the commission of the acts complained of here.

176. The other Defendant Officers are liable for aiding and abetting Lebron in bringing and otherwise facilitating, this malicious prosecution and in

failing to advise superiors and the District Attorney the true facts of the incident at issue.

177. Defendant, City of Allentown, is liable for the acts of the Defendant Officers pursuant to the claims of Municipal (*Monell*) Liability, expressly set forth herein, and which are incorporated by reference as if set forth *et extenso* here.

178. Further, the conduct exhibited by the subordinate Defendant Officers, which occurred on September 8, 2018, was not unexpected.  Neither were they the deeds of an independent, non-supervisory actor.  But, rather, they constituted predictable behavior of subordinates who operated with perceived impunity due to the deliberate indifference of their supervisors and policymakers, and their joint policies, practices and customs, which operated as the moving force behind what the Officers believed to be their unaccountable efforts to engage in what had become, all too customary, Constitutional deprivations by Allentown Police Officers.

179. The likelihood is that, but for the alleged acts and omissions committed by the supervisors and policy makers, the injuries inflicted upon the Plaintiff would not have occurred.

**WHEREFORE,** Plaintiff respectfully requests that this Honorable Court award judgment in Plaintiff's favor and against the aforesaid Defendants, jointly and

severally, in an amount in excess of the One Hundred Fifty Thousand Dollar ($150,000.00) limit for arbitration in the Federal District Court for the Eastern District of Pennsylvania, together with punitive damages against the individual Defendant Officers in their individual capacities, injunctive relief, attorneys' fees and costs, and such other relief which the Court may find appropriate.

<u>**COUNT VI**</u>
**42 U.S.C. §1983**
**Fourteenth Amendment – Equal Protection**
**Racially Motivated Misconduct**
***Against All Defendants***

180. The preceding paragraphs are incorporated herein by reference as though fully set forth.

181. The Plaintiff is a member of a racial minority, as he is an Hispanic man of Dominican ancestry.

182. As described above, the Plaintiff was treated differently than similarly situated white persons.

183. The Allentown Police Department and the City of Allentown have a long history of negative treatment towards people of Hispanic descent, and minorities in general.

184. The Plaintiff was the subject of intentional discrimination as described herein.

185. The Allentown Police Department and the City of Allentown have developed a culture of negative treatment towards people of Hispanic descent and minorities in general, and the individual Defendants actions and/or inactions furthered this culture.

186. Not only was intentional discrimination tolerated, but supervisors and policy makers of the Department and City encouraged it.

187. The Plaintiff was intentionally discriminated against by the Defendants due to his Hispanic roots, in violation of the 4th and 14th Amendments to the United States Constitution.

188. As a direct and proximate result, Plaintiff was injured and suffered damages as stated herein.

189. The Defendant Officers are liable for their personal involvement in the commission of the acts complained of here.

190. Defendants, the City of Allentown, Mayor O'Connell and Chief Alsleben, are liable for the acts of the Defendant Officers pursuant to the claims of Municipal (*Monell*) Liability, and Policymaker and Supervisory Liability expressly set forth herein, and are incorporated by reference as if set forth *et extenso* here.

191. Further, the conduct exhibited by subordinate municipal officers and employees, the Defendant Officers, which occurred on September 8, 2018,

was not unexpected. Neither were they the deeds of independent, non-supervisory actors. But, rather, they constituted predictable behaviors of subordinates who operated with perceived impunity due to the deliberate indifference of their supervisors and policymakers, including O'Connell and Alsleben, and their joint policies, practices and customs, which operated as the moving force behind what the Officers believed to be their unaccountable effort to engage in what had become, all to customary, Constitutional deprivations directed at a targeted member of the unprotected Latino/Hispanic community.

192. The likelihood is that, but for the alleged acts and omissions committed by the other Defendants, the injuries inflicted upon the Plaintiff would not have occurred.

**WHEREFORE,** Plaintiff respectfully requests that this Honorable Court award judgment in Plaintiff's favor and against the aforesaid Defendants, jointly and severally, in an amount in excess of the One Hundred Fifty Thousand Dollars ($150,000.00) limit for arbitration in the Federal District Court for the Eastern District of Pennsylvania, together with punitive damages against Defendants in their individual capacities, injunctive relief, attorneys' fees and costs, and such other relief which the Court may find appropriate.

## COUNT VII
### 42 U.S.C. §1981
### Denial Of Equal Rights Under The Law
### *Against All Defendants*

193. The preceding paragraphs are incorporated herein by reference as though fully set forth.

194. In the actions described above the Defendants deprived the Plaintiff, an Hispanic man of Dominican ancestry, of rights protected by the Constitution of the United States of America, and the Defendants intended to deny the Plaintiff rights enjoyed by white citizens of the United States.

195. The supervisors and Defendant City were aware of the denial of equal rights under the law or were willfully blind, and have developed a practice, policy and custom of depriving non-whites equal rights under the law and either ignored or encouraged the Constitutional violations described above.

196. The Plaintiff suffered harm due to the Defendants' violations of his Constitutional rights with the intent to deprive him of rights enjoyed by white citizens.

197. 42 U.S.C. § 1981 confers on all persons the right to "the full and equal benefit of all laws and proceedings for the security of persons and property …." 42 U.S.C. § 1981(a).

198. Section 1981 provides extensive equal protection rights, but is properly brought pursuant to Section 1983, which provides the remedy for violations of Section 1981 by state actors such as the Defendant Officers.

199. Due to its legislative history and emphasis on equal treatment under the law, Section 1981 is confined to provide a remedy whereas here, discrimination based upon race or alienage is presented as an element of the claim.

200. The Defendant police officers, acting under color of state law, and with racial animus seriously assaulted Plaintiff, an Hispanic man of Dominican ancestry.

201. The Plaintiff was a member of a protected class and the Defendant Officers, acting as agents of the government, under color of state law, treated similarly situated individuals outside of the protected class differently, thereby evidencing purposeful discrimination against the Plaintiff.

202. The City of Allentown is liable for the actions of the Defendant Officers on the basis of the *Monell* assertions made hereinbefore and the fact that the Municipalities deliberate conduct was the moving force.

203. Likewise, Defendants O'Connell and Alsleben are liable for the actions of the Defendant Officers based upon the assertions of their supervisory and policymaking liability made hereinbefore, and the fact that this

Constitutional injury was caused by their deliberately indifferent acts and omissions, which may fairly be said to represent official municipal custom or policy.

204. The Defendant Officer are liable for their personal involvement in the commission of the acts complained of here.

205. Defendants, the City of Allentown, Mayor O'Connell and Chief Alsleben, are liable for the acts of the Defendant Officers pursuant to the claims of Municipal (*Monell*) Liability, and Policymaker and Supervisory Liability expressly set forth herein, and are incorporated by reference as if set forth *et extenso* here.

206. Further, the conduct exhibited by subordinate municipal officers and employees, the Defendant Officers, which occurred on September 8, 2018, was not unexpected. Neither were they the deeds of independent, non-supervisory actors. But, rather, they constituted predictable behaviors of subordinates who operated with perceived impunity due to the deliberate indifference of their supervisors and policymakers, including O'Connell and Alsleben, and their joint policies, practices and customs, which operated as the moving force behind what the Officers believed to be their unaccountable effort to engage in what had become, all to customary,

Constitutional deprivations directed at a targeted member of the unprotected Latino/Hispanic community.

207.  The likelihood is that, but for the alleged acts and omissions committed by the other Defendants, the injuries inflicted upon the Plaintiff would not have occurred.

208.  As a direct and proximate result, the Plaintiff was injured and suffered damages as stated herein and further seeks damages under 42 U.S.C. § 1981.

**WHEREFORE,** Plaintiff respectfully requests that this Honorable Court award judgment in Plaintiff's favor and against the aforesaid Defendants, jointly and severally, in an amount in excess of the One Hundred Fifty Thousand Dollars ($150,000.00) limit for arbitration in the Federal District Court for the Eastern District of Pennsylvania, together with punitive damages against Defendants in their individual capacities, injunctive relief, attorneys' fees and costs, damages under 42 U.S.C. § 1981, and such other relief which the Court may find appropriate.

## <u>COUNT VIII</u>
**42 U.S.C. §1985**
**Conspiracy To Interfere With Civil Rights**
***Against Defendants Lebron, Battoni, Vernon, Smith, Matthews, Bajwa, Walz, Castillo, and Does In Their Individual Capacities***

209.  The preceding paragraphs are incorporated herein by reference as though fully set forth.

210.  As described above, the Defendants conspired to deny the Plaintiff rights afforded non-Hispanic, white citizens, by assaulting him, and then conspiring to conceal what actually occurred.

211.  This conspiracy was engaged in with the intent to deprive the Plaintiff of his Constitutional rights and equal protection of the law.

212.  The Plaintiff suffered harm due to the Defendants' conspiracy to violate his Constitutional rights with the intent to deprive him of equal protection of the law.

213.  As a direct and proximate result the Plaintiff was injured and suffered damages as stated herein and further seeks damages under 42 U.S.C. § 1985.

214.  Specifically, the agreement to deprive the Plaintiff of his rights was motivated by racially discriminatory animus on the parts of the Defendants, and reflected the custom and culture established within the Allentown Police Department for its officers to engage in Constitutional deprivations directed at a targeted member of the Latino/Hispanic community, such as Plaintiff.

215.  Motives, much less motives that have racially discriminatory animus as their source, are not frequently broadcast at the moment they are acted upon – "racial animus is often difficult to prove because it relies on hidden

and unconscious biases" – it is for this reason that such animus is generally identified by circumstantial evidence that the discriminatory offenders acted in accordance with such animus before or after the discriminatory behavior at issue, not only at the very moment of the challenged conduct.

216. Based upon information and belief, Plaintiff believes and therefore avers that a reasonable fact-finder, considering all the material facts, would reasonably conclude that the Defendants' selected the course of action which they followed here because of Plaintiff's race, and that such a conclusion would logically result from consideration of, *inter alia*, the following factors:

a. The racial composition of the parties, with the Plaintiff being Hispanic/Latino and the majority of the Defendant officers being Caucasian, and other Defendants being not of Dominican heritage;

b. The Defendants, based upon information and belief, have engaged in prior acts of physical abuse against those of Plaintiff's heritage in disproportionate numbers when compared to those of non Latino/Hispanic heritage;

c. The Defendant Officers have a history of addressing in an abusive manner and referring to persons of Latino/Hispanic heritage, as they

did here, in racially derogatory and discriminatory terms, both openly and in casual conversation with others; and

d.  The Defendants' conduct cannot be viewed in isolation, but must be considered as part of a sworn force whose racially discriminatory history against Latinos/Hispanics is well-documented and supported by statistically significant evidence, which mirrors the racial animus of the Defendants.

217.  The above factors, individually, would permit a reasonable jury to believe that the unlawful and unconstitutional acts committed by Defendants were motivated by racially discriminatory animus, which was carried on as part of a preconceived scheme or common understanding to deprive the Plaintiff, directly or indirectly, of the equal protection of the law.  However, when combined, these factors lead to the inescapable conclusion that such was clearly the case.

218.  The Defendant Officers are liable for their personal involvement in the commission of the acts complained of here.

219.  Defendants, the City of Allentown, Mayor O'Connell and Chief Alsleben, are liable for the acts of the Defendant Officers pursuant to the claims of Municipal (*Monell*) Liability, and Policymaker and Supervisory Liability

expressly set forth herein, and are incorporated by reference as if set forth *et extenso* here.

220.  Further, the conduct exhibited by subordinate municipal officers and employees, the Defendant Officers, which occurred on September 8, 2018, was not unexpected.  Neither were they the deeds of independent, non-supervisory actors.  But, rather, they constituted predictable behaviors of subordinates who operated with perceived impunity due to the deliberate indifference of their supervisors and policymakers, including O'Connell and Alsleben, and their joint policies, practices and customs, which operated as the moving force behind what the Officers believed to be their unaccountable effort to engage in what had become, all to customary, Constitutional deprivations directed at a targeted member of the unprotected Latino/Hispanic community.

221.  The likelihood is that, but for the alleged acts and omissions committed by the other Defendants, the injuries inflicted upon the Plaintiff would not have occurred.

**WHEREFORE,** Plaintiff respectfully requests that this Honorable Court award judgment in Plaintiff's favor and against the aforesaid Defendants, jointly and severally, in an amount in excess of the One Hundred Fifty Thousand Dollars ($150,000.00) limit for arbitration in the Federal District Court for the Eastern

District of Pennsylvania, together with punitive damages against Defendants in their

individual capacities, injunctive relief, attorneys' fees and costs, damages under 42

U.S.C. § 1985, and such other relief which the Court may find appropriate.

**COUNT IX**
**42 U.S.C. § 1983**
**Civil Conspiracy**
***Against Individual Defendants Lebron, Battoni, Vernon, Smith, Matthews,***
***Bajwa, Walz, Castillo, and Does***

222.  The preceding paragraphs are incorporated herein by reference as though fully set forth.

223.  The referenced Defendants participated in a conspiracy to violate the Plaintiff's Constitutional rights.

224.  Direct evidence of conspiracy is rarely available and therefore, the existence of a conspiracy must usually be inferred from the circumstances.

225.  Those circumstances establishing a conspiracy here are very compelling:

   a.  The Defendant Officers were present and, in combination, jointly committed a unconstitutional assault upon the Plaintiff and not one of them cautioned, restrained or prevented the other from engaging in this wrongdoing, even though the opportunity clearly existed to do so, and even though the obligation to do so also existed;

   b.  The Defendant Officers acted fully in concert – one with the other, obviously demonstrating the common plan, scheme or design that

61

they agreed upon, and a meeting of the minds when the assaults occurred;

c.  The Defendant Officers agreed thereafter to fabricate, and did fabricate, a continued story wherein they falsely depicted Plaintiff's acts as aggressive and assaultive, and jointly provided a sanitized version of their own, and fellow officers', assaultive behaviors;

d.  Defendant Officers Lebron, Battoni, Vernon, and Bajwa presented false testimony under oath in the criminal trial of Perez, demonstrating that the said conspiracy continued to be perpetuated through trial;

e.  The sole purpose of these fabrications was an attempt to excuse or otherwise justify and cover-up the unconstitutional assault upon Plaintiff and his Constitutionally guaranteed civil rights; and

f.  The Defendants' false reporting (or non-reporting) was done in concert to avoid the detection of their unlawful and unconstitutional acts.

226.  Plaintiff believes and therefore avers that Defendants acted in accord with the long-standing custom and practices of the APD, which attempted to ensure that information was not reviewed, nor considered, during any use of force review by any Team, the assigned investigator, the supervisor, the

chain of command, the Office of Professional Services, nor any final decision-maker, in this case.

227.  This all constitutes clear evidence of a civil conspiracy engaged in by the Defendants and Does (those co-conspirators who are presently unidentified), who agreed to, and did, conceal independent evidence of the Plaintiff's victimhood and the Defendant Officers' wrong-doing in this case.

228.  Each one of the foregoing intentional acts and/or intentional omissions, evidences a meeting of the minds and an understanding between the Defendant Officers, which has as its successful object, the deprivation of the constitutionally protected rights of the Plaintiff.

229.  It is also clear from the foregoing that the Defendants, and each of them together:

a.  engaged in a single plan, the essential nature and general scope of which was known by them;

b.  executed that plan in a coordinated way and by a common design which had as its probable and nature consequence the violation of Plaintiff's Constitutional rights as set forth herein;

c.  acted in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which was an

agreement between them to inflict continuing Constitutional wrongs against, or injury upon, the Plaintiff as more fully set forth herein; and

d.  as a direct and proximate result of the foregoing, and the overt acts described hereinbefore, Plaintiff suffered the damages enumerated.

230. These actions and circumstances, pre-discovery, would, in and of themselves, warrant a reasonable fact finder in concluding that the Defendants, formed a conspiracy to deprive the Plaintiff of his Constitutionally protected rights because:

a.  They formed a combination by which they, together, aided and abetted the commission and cover-up of unconstitutional and criminal acts of assault, perjury and fabrication of evidence, committed by the Defendant Officers;

b.  This constitutes a "conspiracy"; and

c.  By being state actors who used their conspiracy to deprive the Plaintiff of his Constitutionally protected civil rights as described, each is liable for the harms they inflicted upon the Plaintiff as well as the harms inflicted upon the Plaintiff by fellow co-conspirators, as a result of their concerted actions.

231.  This conspiracy, as it applied to the Plaintiff herein, was an express or implied agreement between the Defendants, to deprive the Plaintiff of his Constitutional rights, *inter alia*, to be free from excessive use of force, and due process.

232.  The Defendants were voluntary participants in the common venture, understood the general objectives of the plan, and knew it involved the likelihood of the deprivation of Constitutional rights, accepted those general objectives, and then agreed, either explicitly or implicitly, to do their part to further those objectives.

233.  The Defendants then did each, either act, or where there was a duty to act, refrained from acting, in a manner intended to facilitate the deprivation of Plaintiff's Constitutional rights as alleged.

234.  An actual deprivation of those rights did occur to the Plaintiff resulting from the said agreement or common design, and as a foreseeable consequence thereof.

235.  The Defendants, and each of them, are jointly and severally responsible for the injuries caused by their fellow co-conspirators even if, or when, their own personal acts or omissions did not proximately contribute to the injuries or other harms which resulted.

236. As a result of the civil conspiracy entered into and acted upon by Defendants Lebron, Battoni, Vernon, Bajwa, Matthews, Walz, Castillo and Does, Plaintiff suffered a deprivation of his Constitutional rights, and suffered damages as stated herein.

**WHEREFORE,** Plaintiff respectfully requests that this Honorable Court award judgment in Plaintiff's favor and against the aforesaid Defendants, jointly and severally, in an amount in excess of the One Hundred Fifty Thousand Dollar ($150,000.00) limit for arbitration in the Federal District Court for the Eastern District of Pennsylvania, together with punitive damages against Defendants in their individual capacities, injunctive relief, attorneys' fees and costs, and such other relief which the Court may find appropriate.

### COUNT X
### 42 U.S.C. §1983
### Violation of Fourteenth Amendment Due Process Rights
### *Against Individual Defendant Officers Lebron, Battoni, Vernon, Smith, Matthews, Bajwa, Walz, Castillo, and Does*

237. The preceding paragraphs are incorporated herein by reference as though fully set forth.

238. The Defendant Officers conspired with each other and deliberately fabricated and suppressed evidence, all in an effort to justify their unconstitutional arrest of, and unconstitutional assault upon, the Plaintiff.

239. Defendant Lebron, *inter alia*, swore out and filed a knowingly false, fabricated, and misleading Affidavit of Probable Cause, Criminal Complaint and Offense Report wrongfully accusing the Plaintiff of criminal conduct which he did not commit.

240. Defendant Lebron's false, fabricated and misleading documents were intentionally and wrongfully corroborated by similar fabrications placed into the officially entered Offense Reports authored individually by the other Officer Defendants.

241. In addition to fabricating false evidence against Plaintiff in his Offense Reports, these fabrications and falsehoods were repeated, at least in part, by Defendants in any Use of Force Reports, Office of Professional Standards and/or Internal Affairs narratives they provided.

242. The aforesaid fabricated evidence was used as a basis for the filing of criminal charges that would not have been filed and/or pursued without its use.

243. Each of the Defendant Officers, as proponents of their own fabricated evidence against Plaintiff, was aware that their own statements were incorrect and offered in bad faith in an effort to secure an unjust conviction of Plaintiff.

244.    The fabricated evidence was so significant that it could have affected the outcome of the criminal case and resulted in the conviction of an innocent man.

245.    In fact, there exists more than a reasonable likelihood that absent the Defendants' fabricated statements, oaths and reports, all of which falsely portrayed Plaintiff as an active and assaultive resistor (rather than the victim of police abuse which he actually was), the Plaintiff would not have been criminally charged and forced to undergo a criminal trial.

246.    Plaintiff is entitled not only to the Fourth Amendment's protection against excessive use of force but also to the due process of law guaranteed to him by the Fourteenth Amendment, during the entire criminal proceedings, including through and after the verdict is entered.

247.    Here, the Defendants due process violations didn't end with a falsified Criminal Complaint and Sworn Affidavit, or even the manufactured common police reports but, continued through trial with the Defendants' presentation of knowingly false testimony under oath – something the Trial Judge, herself a former First Assistant District Attorney and prosecutor, publicly pronounced as the commission of the crime of felony Perjury.

248.    The Defendants' fabrication is an affront to due process of law and, state actors like the Defendant Officers who seek to frame citizens like Plaintiff,

undermine fairness, and are responsible for the corruption of the truth-seeking function of the trial process, and thereby constitute a stand-alone fabricated evidence claim against Defendant Officers cognizable under the due process clause of the Fourteenth Amendment.

249. The Defendant Officers engaged in this fabrication intentionally, willfully, wantonly and with a reckless disregard for the rights of Plaintiff, subjecting each Defendant Officer not only to the imposition of compensatory damages claimed herein, but also to punitive/exemplary damages.

250. Defendant Supervisors and Policymakers are liable for the acts of Defendants pursuant to the claims of Supervisory and Policymaker liability, expressly set forth herein, and which are incorporated by reference as if set forth *et extenso* here.

251. The Defendant City is liable under the doctrine enunciated in *Monell* for all the acts and/or omissions attributed to the individual Defendant Officers for the reasons more fully expressed in COUNT XII, "Municipal Liability", which is incorporated herein as if fully set forth here.

**WHEREFORE,** Plaintiff respectfully requests that this Honorable Court award judgment in Plaintiff's favor against the aforesaid Defendants, jointly and severally, in an amount in excess of the One Hundred Fifty Thousand Dollar ($150,000.00) limit for arbitration in the Federal District Court for the Eastern

District of Pennsylvania, together with punitive damages against Defendants in their

individual capacities, injunctive relief, attorneys' fees and costs, and such other relief

which the Court may find appropriate.

## COUNT XI
### 42 U.S.C. §1983
### Supervisory Liability-Policymaker Liability
### *Against Defendants O'Connell, Alsleben and Does, Individually*

252.  The preceding paragraphs are incorporated herein by reference as though

      fully set forth.

253.  At all times pertinent to the claims made herein, Mayor O'Connell, Chief

      Alsleben and John/Jane Does 1-X occupied both policymaking and

      supervisory positions relative to the City of Allentown's Police

      Department and the subordinate members of its force, concerning which

      all other individual Defendants were officers, members and employees.

254.  Generally speaking, Mayor O'Connell retained ultimate responsibility

      over the operations of the Police Department as the executive of Allentown,

      a City of the Third Class operating under an Optional Plan B form of

      government wherein Mayor O'Connell shared both supervisory and

      policymaking responsibilities with Chief Alsleben when it came to

      Allentown's Police Department, which the Chief headed.

255.  In practice, Mayor O'Connell retains ultimate responsibility to supervise

      and monitor the overall operation of the Police Department, and Chief

Alsleben was responsible to supervise and monitor the day-to-day operations of the Department. Each had final decision-making authority with regard to the operational conduct of the subordinate members of the police force; each retained the authority to measure the conduct and decisions of police subordinates; each played a conjunctive role in fashioning and implementing Departmental police policies, practices, procedures and customs, and often did so in consultation with one another. Each is a person whose actions may fairly be said to represent official municipal policy or custom.

256. Defendants O'Connell and Alsleben implemented and/or presided over several policies and practices that created an unreasonable risk of Constitutional violations on the part of their subordinates, including specifically, the individual Defendants here; and, their failure to change those policies or employ corrective practices is a direct cause of the unconstitutional conduct which was inflicted upon the Plaintiff.

257. Foundationally, among these practices was for O'Connell and Alsleben to ignore the obvious pattern and history of Constitutional abuses committed by the police officers under their supervision.

258. The existing custom and practice followed by Defendants O'Connell and Alsleben was, *inter alia*, largely to ignore Constitutionally implicated

complaints about the conduct of their officers; to fail to properly investigate them; to fail to take corrective and disciplinary action; to allow for the cover-up of police misconduct; to adopt policies which are designed to protect officers and the City from civil liability rather than to protect the citizenry from their unlawful acts; to stifle and deter citizens' complaints; to conceal or otherwise make it extremely difficult to recover information which should be immediately available for policy maker and supervisory review and action; to settle cases requiring the gaging of victims of police misconduct and their counsel so as to deceive the public and prohibit them from knowing the dangerous nature of police officers which the City employs; and to settle cases requiring the dismissal of liable police officers in exchange for placing the liability amorphously upon the City, and requiring settlement language admitting no liability.

259. This deliberate indifference to the violations of their Constitutionally protected rights, not only reinforced the justifiable belief among the citizenry that it was useless to register complaints about police misconduct and abuse, but, it created further ill-will, retribution and even more significantly, sent a message to the members of the police force that their violations of the community's Constitutional rights would be tolerated and go unpunished, thereby encouraging further and even more serious

violations, and an unreasonable risk of just the sort of harms that were visited upon Plaintiff as described herein.

260. The institutionalization of a culture of Constitutionally abusive police misconduct within the Allentown Police Department took a permissive approach to instances of *inter alia*: unlawful discrimination; unlawful searches; unlawful arrests; excessive use of force; the filing of false police Complaints, Affidavits and reports, and the acceptance of false testimony under oath.  This was so obvious as to be apparent to any reasonable supervisor or policymaker, including Defendants O'Connell and Alsleben; and, their indifference to the risks that these customs, practices, and supervisory procedures obviously presented, were the moving force which resulted in the Constitutional violations suffered by the Plaintiff.

261. This was no more true than with the Defendants' deliberate indifference to the need to provide its officers, including most especially, the Defendants here, with more or better training with regard to the safeguards afforded by the Fourth and Fourteenth Amendments, including particularly the prohibitions regarding search and seizure, the use of excessive force and, violations of due process.

262. Defendants O'Connell and Alsleben were aware that their officers routinely confront situations that may require the use of force, including

deadly force, that such situations often involve difficult decisions on the part of officers about how much force to use or whether to use force at all, and that excessive force liability will frequently result if officers use more force than is reasonably necessary under the circumstances.

263. Defendant's O'Connell and Alsleben were aware of the numerous incidents of the excessive use of force that had been committed by members of the Department in the past, including those involving the Defendants *sub judice*, and they failed to subject them and other police offenders to appropriate evaluation, discipline, testing and remedial training, thereby demonstrating a tolerance of past and/or ongoing police misbehavior, through knowledge and acquiescence in their subordinates' Constitutional violations.

264. Moreover, the conduct exhibited by Defendants on September 8, 2018, was not that of unexpected, independent, non-policymaking actors, but constituted deliberate and predictable acts of subordinates who operated with a rightly perceived impunity due to the ongoing deliberate indifference of their supervisors and policymakers, including Defendants O'Connell and Alsleben, and their well-established practices, policies and customs which operated as the moving force behind what the officers

thought would be an overlooked and tolerated effort to engage in what had become customary Constitutional deprivations.

265.  The specific lacking supervisory practices or procedures (or policies), which Defendants O'Connell and Alsleben were required at a minimum to promulgate, implement, monitor and, if necessary, modify, include, *inter alia*, the following: a heightened supervisory sensitivity and vigilance for uncovering and eradicating Constitutional violations and Constitutional violators; procedures whereby members of the public who have experienced Constitutional police violations are encouraged to access a simple, convenient, non-retaliatory, and responsive procedure to register their complaints and receive prompt, objective responses; procedures carefully cataloging complaints (legal, formal and informal) and their respective outcomes – by name of both officer and complainant, the nature of the claim, and resolution and corrective action if any; procedures for the efficient, effective, objective and independent investigation of all claims and complaints, for their analysis, and requiring the prompt and open imposition of disciplinary, corrective action or policy or procedural change; procedures for promptly responding to those who registered complaints and for securing feedback concerning the resolution reached (necessary to restore good community relations and to encourage the belief

that their complaints will not be ignored); procedures requiring remedial training in Fourth Amendment safeguards including the use of force limitations; procedures requiring training and remedial retraining in the Fourteenth Amendment safeguards and, especially the essential need for accurate, objective and comprehensive Complaint, report and Affidavit writing; practices and procedures for officer conduct which places the focus of the truth-seeking process and on eliminating police misconduct rather than protecting it from prosecution, punishment or discipline; procedures for the complete statistical analysis of police complaints from whatever source, I.A. outcomes, use of force incidents, the race/ethnicity of complainants and of use of force victims, criminal charges filed, prosecutions pursued and criminal convictions secured, etc.; procedures which permit the prompt identification and retrieval of all complaints, outcomes, and evidence, (including videos) on an individual officer basis; etc.

266.   The existing customs within the Allentown Police Department created an unreasonable risk of injury to citizens such as Plaintiff, in the absence of the above-specified supervisory practices.

267.   Defendants O'Connell and Alsleben were aware that the risks existed because they were obvious and because they had previously resulted in

constitutional claims and violations by officers under their supervision and millions of dollars paid in past settlements and verdicts.

268. Defendants O'Connell and Alsleben were indifferent to these risks, given their failure to punish or otherwise remediate past conduct which resulted in adverse consequences from those risks, and their failure to modify departmental practices, policies, General Orders, and procedures which have been brought to their attention as being seriously deficient, if not unconstitutional on their face.

269. The underlying Constitutional violations inflicted on the Plaintiff resulted from Defendants O'Connell and Alsleben's failure to employ the above, and other, supervisory practices, or policies, and failing to train, instruct, properly test and monitor the line supervisors below them in the chain of command.

270. As a result of the deficient supervision and policymaking of the Defendants, Plaintiff suffered the damages alleged herein.

**WHEREFORE,** Plaintiff respectfully requests that this Honorable Court award judgment in Plaintiff's favor and against the aforesaid Defendants, jointly and severally, in an amount in excess of the One Hundred Fifty Thousand Dollars ($150,000.00) limit for arbitration in the Federal District Court for the Eastern District of Pennsylvania, together with punitive damages against Defendants in their

individual capacities, injunctive relief, attorneys' fees and costs, and such other relief which the Court may find appropriate.

## COUNT XII
### 42 U.S.C. § 1983
### Municipal Liability
### *Against The City Of Allentown*

271. The preceding paragraphs, especially those which set forth, in and of themselves, facts upon which *Monell* liability against the City of Allentown will safely reside, are incorporated herein by reference as though fully set forth.

272. Prior to September 8, 2018, the Defendant City of Allentown either failed to develop proper policies or, developed and maintained policies and/or customs exhibiting deliberate indifference to the Constitutional rights of persons in Allentown, which caused the aforesaid violations of Plaintiff's Constitutional rights.

273. The violations of Plaintiff's Constitutional rights under the Fourth and Fourteenth Amendments to the United States Constitution, Plaintiff's damages, and the conduct of the individual Defendants were directly and proximately caused by the actions and/or inactions of Defendant City of Allentown, which has encouraged, tolerated, ratified, and has been deliberately indifferent to, *inter alia*, the following policies, patterns, practices, and customs, and to the need for more or different training,

testing, enforcement, supervision, investigation, or discipline in the areas of:

a. The use of force by police officers;

b. The proper exercise of police powers, including, but not limited to the making of an arrest, and the use of force;

c. De-escalation techniques;

d. Cultural sensitivity;

e. The monitoring of officers whom it knew or should have known were suffering from implicit bias, emotional, psychological, and/or drug dependent problems that impaired their ability to function as officers;

f. Identifying and remediating, and/or disciplining police officers who were the subject of prior civilian or internal complaints of misconduct;

g. Police officers' use of their status as police officers to intimidate citizens and to employ the unreasonable use of force or to achieve ends not reasonably related to their police duties;

h. Adherence to established policies, procedures, directive, and instructions regarding crowd interactions, limitations on search and

seizure, and the avoidance of the use of force under such circumstances as presented by this case; and

i. The proper sanctioning or disciplining of officers who are aware of and conceal, and/or aid and abet, violations of Constitutional rights of citizens by other Allentown police officers including by way of false reporting, false swearing and by perjurous testimony.

274. It was also the policy and/or custom of the Defendant City of Allentown to inadequately and improperly investigate citizen and internal complaints of police misconduct, and acts of misconduct were instead tolerated and/or justified by the City of Allentown, including, but not limited to, complaints of citizens, especially minority citizens.

275. It was also the policy and/or custom of the Defendant City of Allentown to inadequately screen and test during the hiring process (including psychological and drug screening) and to fail to intermittently test thereafter, and to inadequately train and supervise its police officers, including Defendant police officers, thereby failing to adequately discourage further Constitutional violations on the part of its police force in general, and Defendant Officers in particular.

276. The Defendant City of Allentown did not require or demand appropriate in-service training or re-training of officers who were known to have

exhibited intemperance, lack of self-discipline, lack of integrity, implicit bias or who were known to have engaged in police misconduct or who were known to encourage or tolerate same.

277. In fact, no officer of any rank, in any department of the APD, ever came to a training director and recommended any changes in the officer training to prevent the type of Constitutional violations which occurred here, including the excessive use of force, eventhough excessive force claims were numerous and, eventhough the City of Allentown was required to pay out millions of dollars in excessive force claims in the past.

278. The Defendant City of Allentown also did not adopt needed policies, which should have been intended and calculated to avoid the Constitutional violations referred to herein, including specifically those that follow.

279. The lacking practices, procedures, General Orders or policies, which Defendant City of Allentown was required, at a minimum, to promulgate, implement, monitor and, if necessary, modify, include, *inter alia*, the following: procedures employing heightened supervisory sensitivity and vigilance for uncovering and eradicating unconstitutional violations, especially those that are driven by overly aggressive and poorly trained officers; procedures whereby members of the public who have experienced

Constitutional police violations are encouraged to access a simple, convenient, non-retaliatory, and responsive procedure to register their complaints and receive prompt, objective responses; procedures carefully cataloging complaints (legal, formal and informal) and use of force, and their respective outcomes – by name of both complainant and officer, nature of claim, evidence available and resolution, including corrective action, if any; procedures for the efficient, effective, objective investigations of all claims and complaints, their analysis and requiring the prompt and open imposition of disciplinary, corrective action, remedial training, or policy or procedural change; procedures for promptly responding to those who registered complaints, or who self-reported, and for securing citizen feedback concerning the resolution reached (necessary to restore good community relations and to encourage the belief that their complaints will not be ignored); procedures for racial/cultural sensitivity training; procedures for the active pursuit and enlistment of police officers of Hispanic, Dominican and other minority heritages and ethnicities and with multi-lingual abilities; procedures for properly integrating minorities into the force; procedures requiring remedial training in Fourth and Fourteenth Amendment safeguards including citizen's Constitutional rights to be free from unlawful search and/or seizure, and use of force

limitations; procedures requiring testing, training and remedial retraining in the Fourteenth Amendment safeguards and, especially the essential need for accurate, objective and comprehensive Complaint, report and Affidavit writing; practices and procedures for officer conduct which insures honest, accurate and objective Complaint, Affidavit and Report writing and which places the focus of the truth-seeking process, including providing honest testimony, and on eliminating police misconduct rather than protecting it from prosecution, punishment or discipline; procedures for immediately identifying circumstances and the identity of officers who are excessive force prone and/or who file fabricated or incomplete reports; procedures for conducting both internal and external objective reviews of all claims of unconstitutional or otherwise unlawful police conduct; procedures for identifying officers who are in need of remedial training and/or testing (including performance testing and training); procedures for testing the validity and efficiency of I.A. and O.P.S. operations; and procedures for effectively and independently, monitoring officers' drug (including steroid) or alcohol abuse (such as random testing) and for monitoring and testing officer's mental health (including anger management issues) and implicit bias.

280.  The existing customs within the Allentown Police Department created an unreasonable risk of injury in the absence of the above-specified rules, regulations, General Orders, practices and procedures.

281.  The City of Allentown policy makers were aware that these risks existed because they were obvious and because these risks had resulted in repeated Constitutional harms, which had occurred previously under their supervision.

282.  The City of Allentown policy makers were indifferent to these risks, given their failure to eliminate or remediate those responsible for the past unconstitutional consequences of said risks, and their failure to modify departmental practices, policies, General Orders, and procedures which have been brought to their attention (including by experts and the courts) as being seriously deficient, if not unconstitutional on their face.

283.  It was the policy and/or custom of the Defendant City of Allentown to allow and even promote the excessive use of force by its officers, as well as the commission of the other Constitutional violations described herein, including the cover-up of such acts and/or omissions.

284.  In spite of numerous and various excessive force complaints made against the APD relating to arrests, physical contact with citizens, and the use of manual devices which deploy force, the City and APD have never

proposed any appropriate changes to the APD's Use of Force Policy to curb excessive use of force, eventhough the City of Allentown was required to pay out millions of dollars in excessive force claims in the past.

285.  Although an expert in police use of force advised the City and APD at least as early as 2013, that the City had in place a defective and unlawful use of force policy and practice that grants unfettered discretion to officers to use force and which expressly permits the use of force on non-assailants, on resistors, and on individuals who have not actually assaulted police officers but merely defended themselves against excessive force, the City and APD never changed its use of force policy to protect its citizens from police abuse.

286.  Other experts have similarly advised the City and APD of its defective, if not unlawful, force policy, but they have ignored these experts and brought no change to remedy these unlawful policies and practices.

287.  As a result of the above described policies and customs and failure to enforce and/or adopt necessary and appropriate policies, police officers of the Defendant City of Allentown, including the Defendants, believed that their actions would not be properly monitored by supervisory officers or the City and reasonably believed that their misconduct would not be investigated or sanctioned, but would be tolerated and even encouraged.

288.  As stated hereinbefore, the promulgation of general orders, policies, or practices which are directed at creating potential defenses for officers' unconstitutional acts, including the assaultive and conspiratorial acts alleged herein, rather than general orders, policies or practices which are directed at identifying, punishing and eliminating those unconstitutional acts, and which ignore the Constitutional protections guaranteed to all citizens, constitutes irrefutable evidence of the City's, its supervisor's and decision-maker's, deliberate indifference to those rights.

289.  The City, its Mayor and Police Chief have previously been made aware of the absolute impropriety of the definition of "complaint" in the APD's General Orders; and, eventhough they have previously been made aware of the need to eliminate the 2.5.11 E (1) and (10) of the Allentown Police Department General Order 2.5 which operates to deprive the citizens of their Constitutional rights, no change in those provisions have been made.

290.  In fact, it is believed and therefore averred, that numerous experts have pointed out numerous substantial deficiencies in the APD's practices, procedures and General Orders, as well as the existence of customs, which have historically resulted in Constitutional violations of citizens' rights under the First, Fourth and Fourteenth Amendments, and which have resulted in the City of Allentown and/or its employees paying out millions

of dollars in settlements and verdicts, the City and APD have not changed a single one of the deficient policies, practices, procedures or General Orders in response.

291. The above described deficient policies and customs, and the failure to enforce, modify, terminate and/or adopt necessary and appropriate policies, practices, procedures, and General Orders, demonstrates a deliberate indifference on the part of the policymakers of the Defendant City of Allentown, which has continued to serve as the moving force behind, and the cause of, the violations of the Plaintiff's rights as alleged herein, as well as the claimed damages which resulted therefrom.

292. But for this deliberate indifference, the injuries, which were suffered by the Plaintiff, would, in all likelihood, not have occurred.

**WHEREFORE,** Plaintiff respectfully requests that this Honorable Court award judgment in Plaintiff's favor and against the Defendant City of Allentown, in an amount in excess of the One Hundred Fifty Thousand Dollar ($150,000.00) limit for arbitration in the Federal District Court for the Eastern District of Pennsylvania, together with injunctive relief, attorneys' fees and costs, and such other relief which the Court may find appropriate.

## COUNT XIII
### State Assault and Battery
#### *Against Individual Defendants Lebron, Battoni, Smith, Matthews, and Does*

293.  The preceding paragraphs are incorporated herein by reference as though fully set forth.

294.  Defendants intentionally assaulted and battered Plaintiff as stated hereinbefore.

295.  As a result of Defendants' assault and battery, Plaintiff suffered the damages stated herein.

**WHEREFORE,** Plaintiff respectfully requests that this Honorable Court award judgment in Plaintiff's favor and against Defendants Officers, jointly and severally, in an amount in excess of the One Hundred Fifty Thousand Dollar ($150,000.00) limit for arbitration in the Federal District Court for the Eastern District of Pennsylvania, together with punitive damages against Defendants in their individual capacities and, such other relief, including injunctive relief, which the Court may find appropriate.

## COUNT XIV
### State Constitutional Violations
#### *Against Individual Defendants Lebron, Battoni, Vernon, Smith, Matthews, Bajwa, Walz, Castillo, and Does*

296.  The preceding paragraphs are incorporated herein by reference as though fully set forth.

297.   The conduct of the Defendants, as alleged herein, was violative of the Plaintiff's rights under Article I, Section 1, Article I, Section 8 and Article I, Section 9 of the Constitution of the Commonwealth of Pennsylvania.

298.   As a result of the Defendants' conduct, which was violative of the guarantees afforded Plaintiff under the Pennsylvania Constitution, Plaintiff suffered the damages stated herein.

299.   Because the Supreme Court of Pennsylvania still has not ruled on the precise issue of whether these sections of the Pennsylvania Constitution provide a private cause of action for monetary damages to its citizens, Plaintiff limits this claim to his well-recognized right to injunctive relief – prohibiting the Defendants from their continued engagement in the acts complained of herein.

300.   Plaintiff believes and therefore alleges that he is at continuing risk to suffering the identical harms by these Defendants in the event that court intervention does not occur and/or an appropriate permanent injunction is not entered.

**WHEREFORE,** Plaintiff respectfully requests that this Honorable Court award judgment in Plaintiff's favor and against all Defendant Officers, jointly and severally, in the form of equitable relief.

## COUNT XV
### State Civil Conspiracy
*Against Individual Defendants Lebron, Battoni, Vernon, Smith, Matthews, Bajwa, Walz, Castillo, and Does*

301.    The preceding paragraphs are incorporated herein by reference as though fully set forth.

302.    The referenced Defendants conspired to engage in the tortious State claims alleged herein, whereby each Defendant acted in concert, pursuant to an agreement, to cause the stated harms or in some way facilitated the conspiratorial objective of inflicting the resulting harms, upon the Plaintiff, by their own acts or omissions or by those of fellow co-conspirators.

303.    As a result of the aforesaid conspiracy engaged in by Defendants, Plaintiff suffered the damages stated herein.

**WHEREFORE,** Plaintiff respectfully requests that this Honorable Court award judgment in Plaintiff's favor and against Defendants, jointly and severally, in an amount in excess of the One Hundred Fifty Thousand Dollar ($150,000.00) limit for arbitration in the Federal District Court for the Eastern District of Pennsylvania, together with punitive damages against Defendants in their individual capacities and, such other relief, including injunctive relief, which the Court may find appropriate.

### OTHER

304.    Plaintiff respectfully requests a jury to deliberate upon the within causes of action.

305.   The within case is not subject to arbitration.

306.   Where permitted, the Plaintiff demands reasonable legal fees, costs, interest, expenses, delay damages, compensatory damages, punitive damages and any other damages deemed appropriate by the Court.

307.   Plaintiff requests that this Honorable Court issue declaratory and injunctive relief, as appropriate, declaring the within described practices to be unlawful, and enjoining their present and continued employment and effects.

**WHEREFORE,** Plaintiff respectfully requests that this Honorable Court for each Count alleged:

a.   Award compensatory damages to Plaintiff against the Defendants, jointly and severally, in an amount in excess of $150,000.00 exclusive of interest and costs in each of the foregoing Counts;

b.   Award punitive damages to Plaintiff against the individual Defendants, in their individual capacities, jointly and severally, in an amount in excess of $150,000.00 exclusive of interest and costs in each of the foregoing Counts;

c.   Award reasonable attorney's fees and costs to the Plaintiff, as may be awardable pursuant to 42 U.S.C. Section 1988, the Civil Rights

Attorney's Fees Award Act of 1976, or any other appropriate statutory provisions;

d.   Enter an Order enjoining Defendants from engaging in the future in the conduct identified in the Complaint as violative of 42 U.S.C. §§ 1981, 1983, 1985, the 4th and 14th Amendments of the Constitution of the United States, and Article I, Section 1, Article I, Section 8, and Article I, Section 9 of the Pennsylvania Constitution; and further affirmatively requiring the Defendant City of Allentown to engage in appropriate remedial efforts to adopt, and enforce, policies for the Allentown Police Department that are calculated and intended to preclude the conduct alleged to have been engaged in by the Defendants named herein and providing for the independent monitoring of same; and

e.   Award such other and further relief, as this Court may deem appropriate.


Respectfully Submitted,

Dated: September 3, 2020              By:  _Robert E. Goldman_____

Robert E. Goldman, Esquire
PA Attorney I.D. # 25340
535 Hamilton Street, Suite 302
Allentown, PA 18101
(610) 841-3876
reg@bobgoldmanlaw.com
Attorney for Plaintiff John Perez

# EXHIBIT A

1

1

2

3    COURT OF COMMON PLEAS OF LEHIGH COUNTY, PENNSYLVANIA

4                              CRIMINAL

5

6

COMMONWEALTH OF PENNSYLVANIA    ) NO. 4608/2018
7                                )    VOLUME III
                    vs.          )
8                                )
            JOHN PEREZ,          )
9                                )
                Defendant        )
10

11                      NOTES OF TESTIMONY
12                         JURY TRIAL

13              FRIDAY, FEBRUARY 21ST, 2020
                    Courtroom No. 2D
14              Lehigh County Courthouse
            Allentown, Pennsylvania 18101
15

16   HEARD BEFORE THE HONORABLE MARIA L. DANTOS, J.

17
     APPEARANCES:
18

19       JARED HANNA, ESQUIRE
         ASSISTANT DISTRICT ATTORNEY
20       -- On behalf of the Commonwealth

21       ROBERT GOLDMAN, ESQUIRE
         -- On behalf of the Defendant
22

23

24                  *       *       *

25

1              THE COURT:  Are we ready?

2              MR. McGEEHIN:  We are, Judge.

3              THE COURT:  Let's get them.

4              MR. McGEEHIN:  All rise, please.

5              (Whereupon, the jurors were brought into

6      the courtroom at 11:06 a.m.).

7              MR. McGEEHIN:  This honorable court is

8      now in session.  Please be seated.

9              THE COURT:  Good morning, ladies and

10     gentlemen.  I understand you have reached a

11     verdict.  Is that correct?

12             FOREPERSON:  Yes.

13             THE COURT:  We will collect that from

14     you now.

15             (Whereupon, the verdict was handed to

16     the Court and the jury was given roll call.

17             COURT CLERK:  Ladies and gentlemen of

18     the jury, will you please rise and respond to a

19     roll call of your juror number by answering here?

20     Juror number one.

21             JUROR NO. 1:  Here.

22             COURT CLERK:  Juror number two.

23             JUROR NO. 2:  Here.

24             COURT CLERK:  Juror number three.

25             JUROR NO. 3:  Here.

 1                    COURT CLERK:  Juror number four.

 2                    JUROR NO. 4:  Here.

 3                    COURT CLERK:  Juror number five.

 4                    JUROR NO. 5:  Here.

 5                    COURT CLERK:  Juror number six.

 6                    JUROR NO. 6:  Here.

 7                    COURT CLERK:  Juror number seven.

 8                    JUROR NO. 7:  Here.

 9                    COURT CLERK:  Juror number eight.

10                    JUROR NO. 8:  Here.

11                    COURT CLERK:  Juror number nine.

12                    JUROR NO. 9:  Here.

13                    COURT CLERK:  Juror number ten.

14                    JUROR NO. 10:  Here.

15                    COURT CLERK:  Juror number 11.

16                    JUROR NO. 11:  Here.

17                    COURT CLERK:  Juror number 12.

18                    JUROR NO. 12:  Here.

19                    COURT CLERK:  You may be seated.

20                    THE COURT:  The clerk will record the

21     verdict.

22                    COURT CLERK:  Commonwealth v. John

23     Perez, case No. CR-4608-2018.

24                    VERDICT.  AND NOW, February 21st, 2020,

25     we the jurors empaneled on the above case find the

1    defendant, John Perez, not guilty of Count 1,

2    resisting arrest; not guilty of Count 2, disorderly

3    conduct.  So say you all?

4            JURORS:  Yes.

5            THE COURT:  Ladies and gentlemen, thank

6    you so much for your participation in this very

7    difficult case.

8            Your involvement, obviously we couldn't

9    bring this to a close without you.  So from

10    everyone involved, my deepest gratitude.

11            I would like to talk to you before you

12    leave, but your service is concluded and you don't

13    have to stay.

14            But give me a minute when you get back

15    in the room and -- I'm actually going to have you

16    stay for a moment while I deliver my remarks.

17            I wish on this day that this courtroom

18    were packed with people.  It's not.  Nobody's here.

19    Nobody's listening.  And I'm not trying to incite

20    anyone in the community nor am I trying to incite

21    the Allentown Police Department but I have some

22    things to say.

23            I will try to be brief and tempered in

24    my remarks.  I am not an Ivory Tower Judge.  I did

25    my time from all areas of this courtroom.  I worked

1    with some of the finest men and women that law

2    enforcement had to offer.

3              I spent a decade out at night with

4    police in the D.A.'s Office on raids, on search

5    warrants, on investigations, conducting interviews

6    at murder scenes.  I thought I had seen it all.

7              I was very proud of my years of service.

8    I tried to provide to my community.  I do protect

9    and serve.

10             But then you come in here with this case

11   and proudly display to this community how you talk

12   to people.

13             There were at least nine Allentown

14   Police Officers there that night.  That is likely

15   ninety percent of the evening's platoon.  That is a

16   lot for a 200 man department.

17             You came into that scene like angry,

18   hostile bullies from your first contact with those

19   citizens, and especially Officer Battoni.

20             For not the first time in recent history

21   I became ashamed.  I was embarrassed.  I was

22   ashamed of the officers, and their conduct, and

23   their words and actions, and I was ashamed of the

24   office I spent 17 years in that they would bring

25   this prosecution.

6

1          Now there's going to be people, it's
2     already happened, who come and say, "Oh, Judge
3     Dantos, those law enforcement officers were right
4     in what they did.  What was he doing coming out of
5     his house?  What was he doing lipping off?  You
6     know "those people", as the officers said, are your
7     community.
8          They called the police because there was
9     a man with a gun in their neighborhood who was, by
10    the way, not because the Commonwealth brought it
11    out, later found, a man with a gun.  Had nothing to
12    do with these people.
13         Do you know how hard it is for members
14    of that community to call the police?  What
15    happened to protect and serve?  Isn't that still on
16    the cars?  You come into that community because
17    they had the courage to call you and ask you for
18    help.
19         And by Officer Lebron's own testimony,
20    to everybody who wants to back the police in this
21    case, his own testimony "no crime was committed
22    when he shoved the defendant down on the ground".
23    That is a fact.  That is this case.
24         I have seen murder cases, shootings,
25    robberies, burglaries, pled to all manner of

1      offers.   In this case, nothing?

2                 You chose to, instead, put on display

3      police officers calling people pussies, bitches,

4      threatening to shoot a dog, forming your disgusting

5      blue line of four officers who turned their backs

6      and said they saw nothing.

7                 You perjured yourselves.   You escalated

8      a situation without cause.   Cops smirking on the

9      stand at this jury, laughing at the defense

10     attorney, high-fiving in the hallway after

11     testimony as if there were something, anything, to

12     be proud of here.

13                You, Officer Lebron, shoved Mr. Perez

14     because you were mad, period.   And then you got up

15     on this stand and told that jury that you were just

16     trying to make some space.   That is not what

17     happened.

18                And this prosecution, excuse me, ladies

19     and gentlemen, but is no different than coming in

20     here and saying to a jury, "Ladies and gentlemen,

21     who do you believe?   Me, the good guys?   Or your

22     lying eyes?"

23                It's all on video and yet they come in

24     here and tell you something that is not

25     substantiated by that video.

1              So for everyone in the community who has

2    only seen the Morning Call video, I invite you to

3    look at the evidence that this jury saw from the

4    body cams of these very officers who proudly got up

5    here and prosecuted this case against this man.

6              It's a vicious cycle.  I've seen men and

7    woman exhibit great professionalism in encountering

8    situations where they were spit on by the

9    community, hit on by members of the community.

10             Perhaps with police community tension so

11   high now if you showed even a small human level of

12   respect to this community we wouldn't even be here.

13             Nine officers, most of the nightshift,

14   pulling cars from other areas of the city because

15   you lost it.  That's what happened.  You lost it.

16   Over nothing.  Because someone was talking to you

17   in a manner you didn't like?  No crime.  You serve

18   them.

19             Choices were made.  I warned the

20   Commonwealth and yet you displayed this conduct for

21   the world to see.  It's shameful.  I'd really like

22   to be a healer.  I would really like to unite this

23   community between law enforcement and the citizens.

24   But the blame for this lays with you and it is for

25   you to fix.

9

1          I am grateful for this jury.  I am

2    grateful for the opportunity of calling this out

3    for what it is.  You're excused.

4          Mr. Perez, please stand.  My common

5    response to people who resist arrest is, "when the

6    police show up and they tell you to leave, leave."

7    "when the police show up and they tell you to stop

8    talking, stop talking."

9          However, the law allows for what you did

10    that night.  It was, in my humble opinion, an

11    unlawfully excessive use of force just as

12    justification allows you to then defend yourself.

13    You are released.

14          Please wait for me in the jury room.  We

15    are adjourned.

16          MR. MCGEEHIN:  All rise, please.

17          (Whereupon, the jurors were taken from

18    the courtroom at 11:20 a.m.).

19          *      *      *

20

21

22

23

24

25

1                         CERTIFICATION

2

3           I hereby certify that this transcript of

4      proceedings is true and correct and meets the format

5      specifications established by the Supreme Court of

6      Pennsylvania in Rule 4010.

7

8

9      Date: 5/05/20

10

11

12

13           DOLORES YOUNG, RPR/RMR/CRR

14           Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25